## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

SHANNON CLEMENTS and SKYE
CLEMENTS, individually and on behalf of all
others similarly situated,

       Plaintiffs

v.

CVS HEALTH CORPORATION; CVS
PHARMACY, INC.; CAREMARK RX,
L.L.C.; CAREMARK, L.L.C.;
CAREMARKPCS HEALTH, L.L.C.; ZINC
HEALTH VENTURES, LLC; ZINC HEALTH
SERVICES, LLC; CAREMARK ARIZONA
SPECIALTY PHARMACY, L.L.C.;
CAREMARK CALIFORNIA SPECIALTY
PHARMACY, L.L.C.; CAREMARK
FLORIDA SPECIALTY PHARMACY, LLC;
CAREMARK ILLINOIS SPECIALTY
PHARMACY, LLC; CAREMARK KANSAS
SPECIALTY PHARMACY, LLC;
CAREMARK MASSACHUSETTS
SPECIALTY PHARMACY, LLC;
CAREMARK MICHIGAN SPECIALTY
PHARMACY, LLC; CAREMARK NEW
JERSEY SPECIALTY PHARMACY, LLC;
CAREMARK NORTH CAROLINA
SPECIALTY PHARMACY, LLC;
CAREMARK TENNESSEE SPECIALTY
PHARMACY, LLC; EVERNORTH
HEALTH, INC.; EXPRESS SCRIPTS, INC.;
EXPRESS SCRIPTS ADMINISTRATORS,
LLC; MEDCO HEALTH SOLUTIONS, INC.;
ESI MAIL PHARMACY SERVICE, INC.;
EXPRESS SCRIPTS PHARMACY, INC.;
ASCENT HEALTH SERVICES LLC;
ACCREDO HEALTH GROUP, INC.;
UNITEDHEALTH GROUP, INC.; OPTUM,
INC.; OPTUMINSIGHT, INC.; OPTUMRX,
INC.; OPTUMRX HOLDINGS, LLC; and
EMISAR PHARMA SERVICES LLC

       Defendants.

Case No. _____

**JURY TRIAL DEMANDED**

**ORIGINAL CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Introduction ..................................................................................................................1

Parties .........................................................................................................................5

Jurisdiction and Venue ..............................................................................................26

Factual Allegations ...................................................................................................26

    I.      Background: PBMs increasingly control Americans' access to drugs and
           the prices Payors pay. ................................................................................26

    II.     The PBM market's broad horizontal concentration and deep vertical
           integration make it extraordinarily susceptible to collusion. .................30

          A.     Horizontal Concentration..................................................................30

          B.     Vertical Integration ..........................................................................31

    III.    The Big 3 have an ongoing forum to collude. .......................................40

          A.     The Big 3 dominate and regularly convene through the national
               association of PBMs. ........................................................................40

          B.     Since 2012, the Big 3 have controlled the PCMA Board of
               Directors...........................................................................................42

          C.     Control of the PCMA's specialty drug division is also dominated
               by the Big 3......................................................................................46

          D.     The Big 3 regularly convene through the PCMA, including routine
               private meetings. ..............................................................................48

    IV.    The Big 3 employ multiple schemes to garner profit well-above
           competitive levels. .................................................................................53

           A.     Formularies ......................................................................................54

          B.     Rebates..............................................................................................57

          C.     The Big 3 rebate scheme creates an anti-competitive market..................61

          D.     The Big 3 rebate scheme constitutes commercial bribery. ........................71

          E.     Defendants steer patients to Big 3-affiliated pharmacies to
               minimize competition. ......................................................................72

F.       Defendants' practices have led to dramatic price increases of life-saving drugs. ..........................................................75

G.       Drug prices spiked following Big 3 meetings..............................79

V.     Plaintiffs Purchased Drugs Directly from Defendants...........................80

Antitrust Injury..................................................................................81

Market Power....................................................................................82

Class Action Allegations.....................................................................84

Causes of Action................................................................................87

**Count I: Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) on Behalf of the Class** ..................87

**Count II: Commercial Bribery in Violation of Section 2(c) Robinson-Patman Act (15 U.S.C. § 13(c)) on Behalf of the Class** .........................92

Prayer for Relief................................................................................93

Jury Demand.....................................................................................95

## CLASS ACTION COMPLAINT

Shannon Clements and Skye Clements ("Plaintiffs"), on behalf of themselves and the Class of all other persons similarly situated, files this Class Action Complaint against CVS Health Corporation; CVS Pharmacy, Inc.; Caremark Rx, L.L.C.; Caremark, L.L.C.; CaremarkPCS Health, L.L.C.; Zinc Health Ventures, LLC; Zinc Health Services, LLC; Caremark Arizona Specialty Pharmacy, L.L.C.; Caremark California Specialty Pharmacy, L.L.C.; Caremark Florida Specialty Pharmacy, LLC; Caremark Illinois Specialty Pharmacy, LLC; Caremark Kansas Specialty Pharmacy, LLC; Caremark Massachusetts Specialty Pharmacy, LLC; Caremark Michigan Specialty Pharmacy, LLC; Caremark New Jersey Specialty Pharmacy, LLC; Caremark North Carolina Specialty Pharmacy, LLC; Caremark Tennessee Specialty Pharmacy, LLC; Evernorth Health, Inc.; Express Scripts, Inc.; Express Scripts Administrators, LLC; Medco Health Solutions, Inc.; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Ascent Health Services LLC; Accredo Health Group, Inc.; UnitedHealth Group, Inc.; Optum, Inc.; OptumInsight, Inc.; OptumRx, Inc.; OptumRx Holdings, LLC; and Emisar Pharma Services LLC, and allege and state, based on personal knowledge as to themselves and upon information and belief as to the other allegations, as follows:

## INTRODUCTION

1.      This antitrust class action lawsuit challenges the unlawful conduct of the three major Pharmacy Benefit Managers (PBMs), their associated rebate aggregators (sometimes called GPOs), and associated retail, mail order, and specialty pharmacies, which have manipulated the U.S. pharmaceutical market to inflate drug prices and restrict competition, thereby causing patients and third-party payors who finance or reimburse the cost of prescription drugs on behalf of insured individuals (together, the "Payors") to pay supracompetitive prices on non-insulin prescription drugs. Defendants have used their market dominance to solicit and extract bribes and kickbacks in

the form of exorbitant rebates and fees from drug manufacturers, creating an artificial inflation of drug list prices. This practice harms the Payors, who bear these inflated prices.

2. *First*, beginning in at least 2012, and continuing thereafter to the present, Defendants have explicitly or implicitly colluded and conspired to jointly implement and maintain drug manufacturer rebate and administrative fee schemes and to engage in market and customer allocation through the use of steering arrangements in order to artificially raise, fix, maintain, and/or stabilize prescription drug prices in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3. *Second*, Defendants have solicited and received bribes and kickbacks from drug manufacturers in the form of excessive rebates and administrative fees. These bribes are not for services rendered, rather demanded from drug manufactures in exchange for favorable formulary placement for drug manufacturers' non-insulin drugs in violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

4. Defendants have established a formulary management system where favorable placement of specific drugs on formularies is conditioned upon drug manufacturers payment of excessive rebates to the PBMs. Because formulary access is critical to drug manufacturers' ability to sell their products, drug manufacturers are forced to raise their list prices in order to meet these rebate demands. Rather than driving down costs for consumers, this system rewards PBMs with increased rebate revenue while simultaneously inflating drug prices for Payors.

5. Drug manufacturers who offer even larger rebates may receive exclusive placement on PBMs' formularies, meaning bio-similar or generic versions of a specific type of drug are excluded from the formulary. These exclusionary formulary practices not only further contribute to increased drug list prices—they result in patients being denied coverage for medically necessary prescribed drugs altogether, when the drug they need is not included on the PBM-developed

formulary used by their insurer. Through the exclusion of certain drugs from formularies and the preference for others, the PBMs have gained immense leverage over drug manufacturers, forcing them to compete not based on lower prices but on the magnitude of rebates they can offer. This system has created a "chase-the-rebate" dynamic, where drug manufacturers increase list prices to maintain profitability while offering increasingly larger rebates to PBMs. These artificially inflated prescription-drug prices financially burden Payors.

6.    Further still, Defendants are using their industry power to extract administrative and other fees from drug manufacturers, many of which are fees allocated to administration of the PBMs own rebate scheme. Defendants' excessive administrative fees paid by manufacturers caused the manufacturers to increase drug list prices even further.

7.    In conjunction with the rebate and administrative fee scheme, Defendants have employed a number of "optimization levers" to steer patients to affiliated pharmacies and away from unaffiliated, independent pharmacies. These can include, but are not limited to, bundling exclusive services and assets to promote the use of affiliated pharmacies and utilizing information obtained through affiliated insurers to conduct targeted marketing campaigns which employ inaccurate information in order to coerce patients to switch from an independent to affiliated pharmacy.

8.    Defendants have a particularly strong incentive to utilize these steering practices to capture specialty prescriptions at their affiliated specialty pharmacies, due to the high price of specialty drugs and the high margins they provide.

9.    Further, Defendants not only steer patients to their own affiliated pharmacies but to the affiliate pharmacy of a Co-Defendant PBM.

10.    The harm caused by PBMs' anticompetitive practices affects a wide range of prescription drugs, driving up healthcare costs across the board. Many PBMs, including

Defendants, are vertically integrated with their affiliated rebate aggregators, pharmacies, and other entities, allowing them to further obscure the rebate and pricing mechanisms and depriving health plan sponsors and patients of transparency. Despite PBMs' claims that rebates are passed on to patients, data shows that PBMs retain a significant portion of these rebates, reaping billions in profits while patients and third-party payors face higher costs.

11.     Defendants' actions are not mere independent parallel conduct but took place in the context of multiple facts evidencing a conspiracy. These "plus factors" include (a) a motive to conspire; (b) high degree of inter-firm communication; (c) actions against self-interest; and/or (d) market concentration. Defendants had a strong motive to conspire to preserve the presently opaque market structure. The lack of transparency regarding the rebates and pricing mechanisms allows Defendants to protect their profits without having to compete on the merits of price and services. Defendants use the Pharmaceutical Care Management Association (PCMA) as an ongoing forum to exchange competitively sensitive information. Defendants' actions are against their apparent economic self-interests in the absence of collusion. PBMs should aim to lower drug costs to benefit their clients—third-party payors. Higher drug prices procured by one of such PBMs would discourage third-party payors from using that PBM. Defendants' nationwide conspiracy guarantees that third-party payors have no other option than to purchase PBMs' services from them.

12.     This lawsuit seeks to hold Defendants accountable for their anti-competitive practices and the substantial harm they have caused to Payors. By exploiting their control over drug formularies and leveraging their market power, Defendants have not only stifled competition but also caused widespread financial and health-related harm to millions of Americans. This class action aims to remedy these violations, restore competitive pricing, and ensure that Payors are no longer victimized by artificially inflated drug prices.

4

13.     Plaintiff Shannon Clements is a citizen of Missouri and resides in Grain Valley, Missouri. Plaintiff Clements purchased generic and branded drugs for personal, family, or household use during the Class Period (defined below), including purchasing branded Tirosint in Missouri from 2022 through 2024; purchasing branded Advair HFA and Advair Diskus in Missouri in 2022; and purchasing generic omeprazole from 2021 through 2025. These prescription drugs were purchased directly from Defendants through CVS Pharmacy. Caremark served as the PBM for these purchases. All purchases made by Plaintiff Clements were for personal, family, or household use. As a direct result of Defendant's schemes, Plaintiff Clements suffered damages.

14.     Plaintiff Skye Clements is a citizen of Missouri and resides in Grain Valley, Missouri. Plaintiff Clements purchased generic and branded drugs for personal, family, or household use during the Class Period (defined below), including purchasing branded Tirosint in Missouri from 2022 through 2024. These prescription drugs were purchased directly from Defendants through CVS Pharmacy. Caremark served as the PBM for these purchases. All purchases made by Plaintiff Clements were for personal, family, or household use. As a direct result of Defendant's schemes, Plaintiff Clements suffered damages.

### CVS Caremark Defendants

15.     **Defendant CVS Health Corporation ("CVS Health")** is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Health transacts business and has locations throughout the United States.

16.     CVS Health (through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, and Chief

---

[1] Complaint ¶ 4, *In the Matter of Caremark Rx, LLC, et al.*, Complaint Before the Federal Trade Commission, FTC Docket No. 9437 (Sept. 20, 2024) (hereinafter, FTC Complaint).

Communication Officers) is directly involved in the PBM and pharmacy services that gave rise to Plaintiffs' claims. Among other things, CVS Health sets the overarching policy and strategy to maximize profitability across the entire CVS Health family (including Defendants CVS Caremark and CVS Specialty Pharmacy).

17.     During the relevant time, CVS Health (or its predecessor)[2] has repeatedly, continuously, and explicitly stated that CVS Health:

(a)     "design[s] pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members and helping improve health outcomes;"[3]

(b)     "negotiate[s] with pharmaceutical companies to obtain discounted acquisition costs for many of the products on [CVS Health's] drug lists, and these negotiated discounts enable [CVS Health] to offer reduced costs to clients;"[4] and

(c)     "utilize[s] an independent panel of doctors, pharmacists and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on [CVS Health's] drug lists."[5]

18.     In 2017, CVS Health stated that "CVS Health pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year (PMPY)

---

[2] Until 2014, CVS Health was known as "CVS Caremark." In September 2014, "CVS Caremark Corporation announced that it is changing its corporate name to CVS Health to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health."

[3] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2022).

[4] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2013).

[5] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2022).

the lowest in five years. Despite manufacturer price increases of near 10 percent, CVS Health kept drug price growth at a minimal 0.2 percent."[6]

19.     In November 2018, CVS Health acquired Aetna, Inc. for $69 billion and became the first combination of a major health insurer, PBM, mail order and retail pharmacy chain. As a result, CVS Health controls the health plan/insurer, the PBM and the pharmacies utilized by approximately 40 million Aetna members in the United States. CVS Health controls the entire drug pricing chain for these 40 million Americans.

20.     **Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")** is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is a wholly owned subsidiary of CVS Health.

21.     CVS Pharmacy owns and operates pharmacies throughout the United States.

22.     In its capacity as a retail pharmacy, CVS Pharmacy, working in conjunction with its corporate affiliate entities, assisted CVS Health and CVS Caremark in profiting from the higher list prices produced by Defendants' misconduct by pocketing the spread between acquisition cost for the drugs at issue (an amount well below the list price), and the amounts received from payors (which amounts were based on the list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

23.     CVS Pharmacy is the immediate and direct parent of Defendant Caremark Rx, LLC.

24.     During the relevant time period, CVS Pharmacy provided retail pharmacy services throughout the United States.

---

[6] CVS Health, *Drug Trend Report 2017* at 3 (2018),
https://s2.q4cdn.com/447711729/files/doc_downloads/company_documents/2017-drug-trend-report.pdf.

25.    **Defendant Caremark Rx, L.L.C. ("Caremark Rx")** is a Delaware limited liability company and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

26.    Caremark Rx is a wholly owned subsidiary of Defendant CVS Pharmacy.

27.    During the relevant time period, Caremark Rx provided PBM and mail order pharmacy services throughout the United States.

28.    **Defendant Caremark, L.L.C. ("Caremark")** is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark is a wholly owned subsidiary of Caremark Rx.

29.    During the relevant time period, Caremark, L.L.C. provided PBM and mail order pharmacy services throughout the United States.

30.    **Defendant CaremarkPCS Health, L.L.C. ("CaremarkPCS Health")** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CVS Health is the direct or indirect parent company of CaremarkPCS Health.

31.    During the relevant time period, CaremarkPCS Health provided PBM services throughout the United States.

32.    **Defendant Zinc Health Ventures, LLC** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CVS Health is the direct or indirect parent company of Zinc Health Ventures, LLC.

33.    Zinc Health Ventures, LLC provides PBM services throughout the United States.

34.    **Defendant Zinc Health Services, LLC** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CVS Health is the direct or indirect parent company of Zinc Health Services, LLC.

35.    Zinc Health Ventures, LLC provides PBM services throughout the United States.

36.     Zinc Health Services, LLC and Zinc Health Ventures, LLC are referred to collectively as "Zinc Health."

37.     CVS Health established Zinc Health in 2020 as a group purchasing organization for CVS Health's PBM business. Zinc Health negotiates rebates with drug manufacturers on behalf of its and other third parties' commercial clients.[7]

38.     **Defendant "CVS Specialty Pharmacy"** are limited liability companies whose principal places of business is at the same location as CVS Health.[8]

39.     CVS Specialty Pharmacy provides specialty pharmacy services.

40.     As a result of numerous interlocking directorships and shared executives, Caremark Rx, CVS Pharmacy, and CVS Health are directly involved in the conduct of and control CaremarkPCS Health, CVS Specialty Pharmacy, Zinc Health, and Caremark's operations, management and business decisions related to the at-issue formulary construction, payments to manufacturers, and pharmacy services to the ultimate detriment of patients and payors. For example:

        (a)     During the relevant time period, these parents and subsidiaries have had common officers and directors. Examples include:

---

[7] FTC Complaint at ¶ 4.

[8] "CVS Specialty Pharmacy" collectively refers to: CVS Pharmacy, Caremark Arizona Specialty Pharmacy, L.L.C. (Arizona), Caremark California Specialty Pharmacy, L.L.C (California), Caremark Florida Specialty Pharmacy, LLC (Florida), Caremark Illinois Specialty Pharmacy, LLC (Illinois), Caremark Kansas Specialty Pharmacy, LLC (Kansas), Caremark Massachusetts Specialty Pharmacy, LLC (Massachusetts), Caremark Michigan Specialty Pharmacy, LLC (Michigan), Caremark New Jersey Specialty Pharmacy, LLC (New Jersey), Caremark North Carolina Specialty Pharmacy, LLC (North Carolina), and Caremark Tennessee Specialty Pharmacy, LLC (Tennessee).

9

(i)     Thomas S. Moffatt, a Vice President, Assistant Secretary, and Senior Legal Counsel at CVS Health, has also served as a Vice President, Secretary and Senior Legal Counsel at CVS Pharmacy;

(ii)     Melanie K. Luker. the Assistant Secretary of CVS Pharmacy, Caremark Rx, CaremarkPCS Health, and Caremark, has also served as a Senior Manager of Corporate Services at CVS Health;

(iii)     Carol A. Denale, Senior Vice President and Treasurer of Caremark Rx, LLC, has also served as Senior Vice President, Treasurer and Chief Risk Officer at CVS Health Corporation

(iv)     John M. Conroy has been Vice President of Finance at CVS Health since 2011 and has also served as President and Treasurer of Caremark and CaremarkPCS Health in 2019; and

(v)     Sheelagh Beaulieu has been the Senior Director of Income Tax at CVS Health while also acting as the Assistant Treasurer at CaremarkPCS Health and Caremark.

(b)     CVS Health directly or indirectly owns all the stock of CVS Pharmacy, CVS Specialty Pharmacy, Caremark Rx, Caremark, CaremarkPCS Health, and Zinc Health.

(c)     All the executives of CaremarkPCS Health, Caremark, Caremark Rx, CVS Specialty Pharmacy, CVS Pharmacy, and Zinc Health ultimately report to the executives at CVS Health, including the President and CEO of CVS Health.

(d)     CVS Health, as a corporate family, does not operate as separate entities. The public filings, documents, and statements of CVS Health presents its subsidiaries, including CVS Pharmacy, CVS Specialty Pharmacy, CaremarkPCS Health, Caremark, Zinc Health, and Caremark Rx, as divisions or departments of one unified "diversified

10

health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." CVS Health's recent public filings also disclose that the company "operates a group purchasing organization that negotiates pricing for the purchase of pharmaceuticals and rebates with pharmaceutical manufacturers on behalf of its participants," without identifying Zinc by name.[9] The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all allegations in this Complaint.[10] The CVS Health enterprise and each of these entities, both individually and collectively, engaged in the at-issue misconduct.

41.     Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, Caremark, and CaremarkPCS Health, Zinc Health, and CVS Specialty Pharmacy, including all predecessor and successor entities, are referred to as "CVS Caremark."

42.     CVS Caremark is named as a Defendant in its capacities as a PBM and retail, specialty, and mail order pharmacy.

43.     In its capacity as a PBM, CVS Caremark has the largest PBM market share based on total prescription claims managed. In 2023, CVS Caremark administered 2.3 billion—or approximately 34%—of total prescription claims in the United States. In 2022, CVS Caremark recorded $169.2 in revenue.

***Express Scripts Defendants***

---

[9] CVS Health Corp. Form 10-K, FYE Dec. 31, 2020, 2021, 2022, 2023.

[10] CVS Caremark/CVS Health Annual Report (Form 10-K) (Dec. 31, 2009–2019); *Our Purpose*, CVS HEALTH https://cvshealth.com/about-cvs-health/our-purpose (last visited Jan. 20, 2025); *Quality of Care*, CVS HEALTH https://cvshealth.com/health-with-heart/improving-health-care/quality-of-care (last visited Jan. 20, 2025).

44.     **Defendant Evernorth Health, Inc. ("Evernorth")**, formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.[11]

45.     Evernorth, through its executives and employees, is directly involved in shaping the company policies that inform its PBM and pharmacy services and formulary construction.

46.     On a regular basis, Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM and pharmacy services and formulary activities.

47.     Evernorth is the parent of the Express Scripts pharmacy and Express Scripts Defendants named in this Complaint.

48.     In December 2018, Evernorth was acquired by Cigna for $67 billion, consolidating their businesses as a major health insurer, PBM, and mail order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM, and the mail order pharmacies utilized by approximately 15 million Cigna members in the United States. Evernorth controls the entire drug pricing chain for these 15 million Americans. In 2022, Evernorth earned $140.3 billion in revenue, the majority of which came from Express Scripts, Inc.

49.     In each annual report for at least the last decade, Evernorth has repeatedly, continuously, and explicitly stated:[12]

(a)     "[Evernorth] is one of the largest PBMs in North America . . . [and Evernorth] help[s] health benefit providers address access and affordability concerns resulting from rising drug costs while helping to improve healthcare outcomes."

---

[11] Until 2021, Evernorth Health, Inc. conducted business under the name Express Scripts Holding Company. For the purposes of this Complaint "Evernorth" refers to Evernorth Health, Inc. and Express Scripts Holding Company.

[12] Express Scripts Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

(b)    "[Evernorth] manage[s] the cost of the drug benefit by . . . assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist[ing] clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors [and better care for members] leveraging purchasing volume to deliver discounts to health benefit providers."

(c)    "[Evernorth] works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes."

50.    Even after the being acquired by Cigna, Evernorth "operates various group purchasing organizations that negotiate pricing for the purchase of pharmaceuticals and formulary rebates with pharmaceutical manufacturers on behalf of their participants" and operates the company's Pharmacy Rebate Program while its subsidiary Express Scripts provides "formulary management services" that "assist customers and physicians in choosing clinically-appropriate, cost-effective drugs and prioritize access, safety and affordability." In 2021, Evernorth reported adjusted revenues of $131.9 billion (representing 75.8% of Cigna Corporation's revenues), up from $116.1 billion in 2020.[13]

51.    **Defendant Express Scripts, Inc.** is a Delaware corporation and a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

52.    Express Scripts, Inc. is the immediate or indirect parent of the Express Scripts pharmacy and the other Express Scripts Defendants named in this Complaint.

_____
[13] Cigna Annual Report (Form 10-K) (FYE Dec. 31, 2021).

13

53.     During the relevant time period, Express Scripts Inc. was directly involved in the PBM and pharmacy services.

54.     **Defendant Express Scripts Administrators, LLC**, is a Delaware limited liability company and a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

55.     During the relevant time period, Express Scripts Administrators, LLC provided PBM services throughout the United States.

56.     **Defendant Medco Health Solutions, Inc. ("Medco")** is a Delaware Corporation with its principal place of business located at the same location as Evernorth.

57.     Prior to merging with Express Scripts, Medco provided PBM and mail order services throughout the United States and its principal place of business was 100 Parsons Pond Road, Franklin Lakes, New Jersey.

58.     In 2012, Express Scripts Holding Company acquired Medco for $29 billion.

59.     Prior to the merger, Express Scripts and Medco were two of the largest PBMs in the United States.

60.     Following the merger, all of Medco's PBM and mail order pharmacy functions were combined into Express Scripts, Inc., continuing under the Express Scripts name, with all of Medco's payor customers becoming Express Scripts' customers. The combined company covered over 155 million lives at the time of the merger.

61.     At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, then CEO of Medco, David B. Snow, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to

consumers. This is because our combined entity will achieve even greater purchasing volume discounts from drug manufacturers and other suppliers."[14]

62.    The then-CEO of Express Scripts, George Paz, during a Congressional subcommittee hearing in September 2011, echoed these sentiments: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."[15]

63.    **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

64.    During the relevant time period, ESI Mail Pharmacy Service, Inc. provided the mail order pharmacy services throughout the United States.

65.    **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

66.    During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail order pharmacy services throughout the United States.

67.    **Defendant Ascent Health Services LLC ("Ascent Health")** is a Delaware limited liability company and a wholly owned subsidiary of Defendant Evernorth. Ascent Health's principal place of business is at Mühlentalstrasse 36, 8200 Schaffhausen, Switzerland.

---

[14] *Hearing on the Proposed Merger between Express Scripts and Medco Before the Subcomm. on Antitrust, Competition Policy & Consumer Rights of the S. Comm. on the Judiciary*, 112th Cong. (2011) (prepared statement of David B. Snow, Jr., Chairman and CEO, Medco Health Solutions).

[15] *Id.*

68.     Ascent Health was established by Express Script Defendants in 2019 as a group purchasing organization for the group's PBM business. Ascent Health negotiates rebates with drug manufacturers on behalf of Express Script Defendants' and other parties' commercial clients.

69.     **Defendant Accredo Health Group, Inc. ("Accredo Health")** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Accredo Health's principal place of business is at One Express Way, Saint Louis, MO, 63121.

70.     During the relevant time period, Accredo Health provided specialty pharmacy services throughout the United States.

71.     As a result of numerous interlocking directorships and shared executives, Evernorth and Express Scripts, Inc. are directly involved in the conduct of and control Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Accredo Health, Ascent Health, and Express Scripts Pharmacy, Inc.'s operations, management and business decisions related to the at-issue formulary construction, payments to manufacturers, and pharmacy services. For example:

(a)     During the relevant time period, these parents and subsidiaries have had common officers and directors:

(i)     Officers and/or directors that have been shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Managing Counsel; Dave Anderson, VP of Strategy; Matt Perlberg, President of Pharmacy Businesses; Bill Spehr, SVP of Sales; and Scott Lambert, Treasury Manager Director;

(ii)    Executives that have been shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Senior Counsel;

(iii)    Officers and/or directors that have been shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Priscilla Duncan, Associate Senior Counsel; and Joanne Hart, Treasury Director; and

(iv)    Officers and/or directors that have been shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Managing Counsel; Scott Lambert, Treasury Manager Director; and Joanne Hart, Associate Treasurer.

(b)    Evernorth directly or indirectly owns all the stock of or otherwise controls Express Scripts Administrators, LLC, Accredo Health, Ascent Health, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc.[16]

(c)    All of the executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Accredo Health, Ascent Health, Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

(d)    As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, Accredo Health, Ascent Health, ESI Mail Pharmacy Service, Inc., Medco Health

---

[16] Express Scripts Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2018).

Solutions, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. that gave rise to Plaintiffs' claims in this Complaint.

(e)     The Evernorth corporate family does not operate as separate entities. The public filings, documents, and statements of Evernorth presents its subsidiaries, including Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Accredo Health, Ascent Health, and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people," and which "includes a broad range of coordinated and point solution health services and capabilities, as well as those from partners across the health care system, in pharmacy solutions, benefit management solutions, care delivery and care management solutions and intelligence solutions to deliver custom and flexible solutions that meet the needs of our clients and customers."[17] The day-to-day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all allegations detailed in this Complaint. The Evernorth enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to Plaintiffs' claims.

72.     Cigna Group, the ultimate parent company for each Express Scripts entity, has likewise represented that those entities operate as a single unit to offer pharmacy benefit management services. For example, Cigna Group explains that "[t]he Cigna Group, together with its subsidiaries (either individually or collectively referred to as the 'Company,' 'we,' 'us,' or

---

[17] Express Scripts Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2018).

'our') is a global health company" and that "[w]e negotiate with pharmacies throughout the United States to discount drug prices," "[w]e administer specific formularies for our clients," and "[w]e … provide retail pharmacy network administration, benefit design consultation, drug utilization review, drug formulary management and other services." Cigna Group also explains that it employs "[c]ross-enterprise leverage" to offer its "entire suite of capabilities" to its clients. Cigna Group indicates that its subsidiaries operate as "segments" of a single company. Express Scripts entities operate as a single business unit.

73.     Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Accredo Health, Ascent Health, and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts."

74.     Express Scripts is named as a Defendant in its capacities as a PBM and specialty and mail order pharmacy.

75.     Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States. During the relevant period of this Complaint, Express Scripts controlled up to 30% of the PBM market in the United States.

76.     Express Scripts has only grown larger since the Cigna merger.

77.     Express Scripts' annual revenue is over $100 billion.

78.     Express Scripts contracts with approximately 65,000 retail chain and independent pharmacies that comprise its pharmacy networks, representing over 98% of all retail pharmacies in the nation.

**OptumRx Defendants**

79.     **Defendant UnitedHealth Group, Inc**. **("UnitedHealth Group" or "UHG")** is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

80.     UnitedHealth Group is a diversified managed healthcare company. Its total revenue in 2022 exceeded $324 billion. In 2021, its revenue exceeded $287 billion. Since 2020, its revenues have increased by more than $30 billion per year. The company currently sits fourth on the Fortune 500 list.[18]

81.     UnitedHealth Group offers a spectrum of products and services including health insurance plans through its wholly-owned subsidiaries and pharmacy benefits and prescription drugs through its PBM, OptumRx. More than one-third of the overall revenues of UnitedHealth Group come from OptumRx, which operates a network of more than 67,000 pharmacies.

82.     UnitedHealth Group, through its executives and employees, is directly involved in the company policies that inform its PBM services and formulary construction. For example, executives of UnitedHealth Group structure, analyze, and direct the company's overarching, enterprise-wide policies, including PBM and mail order services, as a means of maximizing profits across the corporate family.

83.     UnitedHealth Group's 2020 Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies—or drug lists—to ensure people get the right medications. [*UnitedHealth Group*] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [*UnitedHealth Group*] also operate[s] [mail order pharmacies] . . . [*UnitedHealth*

---

[18] Fortune, *Fortune Announces 2024 Fortune 500*, PR NEWSWIRE (Jun. 4, 2024), https://web.archive.org/web/20250127091318/https://www.prnewswire.com/news-releases/fortune-announces-2024-fortune-500-302162721.html.

*Group*] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply."[19]

84.     In addition to being a PBM and mail order and specialty pharmacy, UnitedHealth Group owns and controls a major insurance company, UnitedHealthcare. As a result, UnitedHealth Group controls the plan/insurer, the PBM, and the mail order and specialty pharmacy used by approximately 26 million UnitedHealthcare members in the United States. UnitedHealth Group controls the entire drug pricing chain for these 26 million Americans.

85.     UnitedHealth Group states in its annual reports that UnitedHealth Group "uses Optum's capabilities to help coordinate patient care, improve affordability of medical care, analyze cost trends, manage pharmacy benefits, work with care providers more effectively and create a simpler consumer experience." Its 2022 annual report states plainly that it is "involved in establishing the prices charged by retail pharmacies, determining which drugs will be included in formulary listings and selecting which retail pharmacies will be included in the network offered to plan sponsor's members… ." As of year-end 2022 and 2021, UnitedHealth Group's "total pharmaceutical manufacturer rebates receivable included in other receivables in the Consolidate Balance Sheets amounted to $8.2 billion and 7.2, respectively," up even from $6.3 billion in 2020."[20]

86.     **Defendant Optum, Inc.** is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.

---

[19] UnitedHealth Group, Sustainability Report: Fulfilling Our Mission 51 (2020), https://www.unitedhealthgroup.com/content/dam/UHG/PDF/2024/sustainability/2020-sustainability-report.pdf.

[20] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2018); UnitedHealth Group Annual Report (Form 10-K, Ex. 21) (FYE Dec. 31, 2021); UnitedHealth Group Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2022).

87. Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction.

88. For example, according to an Optum Inc. press release, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health service business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payers, life sciences companies and consumers." In this role, Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx" and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform formulary construction and mail order and specialty pharmacy activities.

89. **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

90. During the relevant time period, due to name changes and mergers, a number of different entities make up what is now known as OptumInsight, including Ingenix, Innovus, i3, QualityMetric, Htanalytics, ChinaGate, CanReg, and the Lewin Group.

91. **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota. OptumRx, Inc. is a wholly owned indirect subsidiary of UnitedHealth Group.

92. During the relevant time period, OptumRx, Inc. provided the PBM and mail order and specialty pharmacy services throughout the United States.

93. **Defendant OptumRx Holdings, LLC** is a Delaware limited liability company with its principal place of business located at 11000 Optum Circle, Eden Prairie, Minnesota.

94. OptumRx Holdings, LLC is a wholly owned indirect subsidiary of UnitedHealth Group, Inc. and the direct parent company of OptumRx, Inc.

95.     **Defendant Emisar Pharma Services LLC ("Emisar")** is a Delaware limited liability company with its principal place of business in Ireland. In 2021, OptumRx established Emisar as a group purchasing organization for OptumRx Defendants' PBM business. Emisar is a wholly owned indirect subsidiary of UnitedHealth Group Inc. Emisar negotiates rebates with drug manufacturers on behalf of OptumRx's commercial clients.

96.     As a result of numerous interlocking directorships and shared executives, UnitedHealth Group, OptumRx Holdings, LLC and Optum, Inc. are directly involved in the conduct and control of OptumInsight's, OptumRx, Inc.'s and Emisar's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail order pharmacy services. For example:

(a)     These parent and subsidiaries have common officers and directors, including:

(i)     Sir Andrew Witty is the CEO and on the Board of Directors for UnitedHealth Group and previously services as CEO of Optum, Inc.;

(ii)    Dan Schumacher is Chief Strategy and Growth Officer at UnitedHealth Group, Inc. and is CEO of OptumInsight, having previously served as president of Optum, Inc.;

(iii)   John Rex is a President of UnitedHealth Group, Inc., having previously served as an Executive Vice President and CFO of UnitedHealth Group Inc. since 2016 and previously at Optum beginning in 2012;

(iv)    Terry Clark is a senior vice president and has served as a chief marketing officer at UnitedHealth Group since 2014 while also serving as chief marketing and customer officer for Optum, Inc.;

(v)     Tom Roos has served since 2015 as SVP and chief accounting officer for UnitedHealth Group and Optum, Inc.;

(vi)    Peter Gill has served as SVP and Treasurer for UnitedHealth Group, Inc. and also as Treasurer at OptumRx, Inc.;

(vii)   John Santelli led Optum Technology, the leading technology division of Optum, Inc. serving the broad customer base of Optum and UnitedHealthcare and also served as UnitedHealth Group's chief information officer;

(viii)  Dirk McMahon has served as President and COO of UnitedHealth Group until 2024. He also served as President and COO of Optum from 2017 to 2019 and as CEO of OptumRx from 2011 to 2014;

(ix)    Eric Murphy, now retired, was the Chief Growth and Commercial Officer for Optum, Inc. and also was CEO of OptumInsight, Inc. beginning in 2017.

(b)     UnitedHealth Group directly or indirectly owns all the stock of Optum, Inc., OptumInsight, Inc., OptumRx, Inc., OptumRx Holdings, LLC, and Emisar Pharma Services LLC.

(c)     All the executives of Optum, Inc., OptumInsight, OptumRx, Inc., OptumRx Holdings, LLC, and Emisar Pharma Services LLC ultimately report to the executives, including the CEO, of UnitedHealth Group.

(d)     The UnitedHealth Group corporate family does not operate as separate entities. The public filings, documents, and statements of UnitedHealth Group presents its subsidiaries, including OptumInsight, OptumRx, Inc., OptumRx Holdings, LLC, and Emisar Pharma Services LLC as divisions, departments or "segments" of a single company

24

that is "a diversified family of businesses" that "leverages core competencies" to "help[] people live healthier lives and helping make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all allegations in this Complaint.[21]

(e)     As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of Optum, Inc., OptumInsight, OptumRx, Inc., OptumRx Holdings, LLC, and Emisar Pharma Services LLC and that gave rise to Plaintiffs' claims in this Complaint.

97.     Collectively, Defendants UnitedHealth Group, Optum, Inc., OptumInsight, Inc., OptumRx, Inc., OptumRx Holdings, LLC, and Emisar Pharma Services LLC, including all predecessor and successor entities, are referred to as "OptumRx."

98.     OptumRx is named as a Defendant in its capacities as a PBM and specialty and mail order pharmacy.

99.     OptumRx provides PBM services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities. It is the third largest PBM in the United States. In 2023, OptumRx administered approximately 22% of total prescriptions in the United States. In 2022, OptumRx recorded $99.8 billion in revenue.

100.    Prior to 2011, OptumRx was known as Prescription Solutions. OptumRx rose to power through numerous mergers with other PBMs. For example, in 2012, a large PBM, SXC Health Solutions bought one of its largest rivals, Catalyst Health Solutions Inc. in a roughly $4.14 billion deal. Shortly thereafter, SXC Health Solutions Corp. renamed the company Catamaran

---

[21] UnitedHealth Group, Quarterly Report (Form 10-Q) (Mar. 31, 2017).

Corp. Following this OptumRx's parent company, UnitedHealth Group, bought Catamaran Corp in a deal worth $12.8 billion and combined Catamaran with OptumRx.

101.     Prior to merging with OptumRx (or being renamed), Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. engaged in the at-issue PBM and mail order activities throughout the United States.

102.     Collectively, CVS Caremark, OptumRx, and Express Scripts are referred to as "Defendants" or "PBMs."

## JURISDICTION AND VENUE

103.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 (exclusive of interest and costs), the number of the members of the Class exceeds 100, and at least one member of the putative Class is a citizen of a state different from that of one of the Defendants. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 (federal question; antitrust regulations). The Court has supplemental jurisdiction over Plaintiffs' pendent state law claims pursuant to 28 U.S.C. § 1367.

104.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims occurred in this District, including drug sales and drug dispensing made pursuant to Defendants' formularies; Defendants are subject to personal jurisdiction in this District; and Defendants transacts business in this District.

## FACTUAL ALLEGATIONS

**I.     Background: PBMs increasingly control Americans' access to drugs and the prices Payors pay.**

105.     PBMs are the centerpiece of the complex pharmaceutical distribution and pharmaceutical benefits administration web. They act as third-party intermediaries between pharmaceutical manufacturers, drug wholesalers, insurers and pharmacies in the delivery of

medication to patients. As middlemen among each of these entities in the industry, PBMs oversee prescription drug coverage and insurer reimbursement for more than 200 million Americans—well over half of the United States population.

106. PBMs are central to pharmaceutical transactions because they administer pharmacy benefit management services on behalf of clients—third-party payors. Third-party payors include employers, health insurer plans, labor unions, employer coalitions, and government entities. These payors submit payments on behalf of their members or insureds to healthcare providers and pharmacies for services and prescription drugs rendered to those individuals. When a retail pharmacy sells a drug to a patient, it looks up whether or not that patient holds health insurance and then charges the consumer a price depending on his or her insurance status. Patients with insurance are usually only responsible for paying a portion of the drug's cost, with the third-party payor picking up the remainder of the bill.

107. PBMs market themselves as providing various services to third-party payors including developing drug formularies, creating and managing networks of pharmacies, processing prescription drug claims, reporting drug expenditures, creating and administering clinical programs, and negotiating with pharmaceutical manufacturers for rebates on behalf of their clients.

108. Historically, PBMs provided administrative services for health insurance companies starting in the late 1960s. Over time, PBMs' services and prominence in the pharmaceutical industry grew. PBMs now act as intermediaries between numerous segments of the pharmaceutical supply chain.

109. Initially, PBMs were intended to lower prescription drug costs by leveraging bargaining power of their many clients—third-party payors—to negotiate discounts on the prices of prescription drugs and pass the savings to employers who provide health plans to their employees, and ultimately, patients.

27

110.     Instead, PBMs use their position in the health care industry, lack of transparency, and tremendous size and scale to leverage self-benefitting and anti-competitive practices to maximize profits at Payors' expense. PBMs have the power to decide what medicines are listed on formularies, and ultimately, what medications patients have access to and which they do not, and at what price.

111.     Along with their rapid growth, PBM market share has become increasingly concentrated in the hands of only a few players. CVS Caremark, Express Scripts, and OptumRx (together, the "Big 3") manage 79% of prescription drug claims for approximately 270 million people. CVS Caremark, Express Scripts, and OptumRx have all gained share in the provision of PBM services through mergers and acquisitions.

112.     Given the current level of consolidation, pharmacists, third-party payors, and drug manufacturers have little choice but to interact with the large, dominant PBMs when distributing certain drugs. Therefore, patients do not have any choice but to purchase their prescription drugs through channels other than those impacted by PBMs.

113.     The Big 3 have also become vertically integrated within large conglomerates that provide a broad range of services across nearly every facet of the health care sector, including upstream providers of goods and services including drug private labelers and provider groups; midstream distributors including retail, mail order, and specialty pharmacies; and downstream entities including large health insurers which, through their health plans and plan sponsor services, provide coverage for hundreds of millions of Americans.

114.     The Big 3 leverage their incredible influence over drug pricing and purchasing decisions to implement various practices to generate tremendous profit with margins far above that of a competitive market. For example, vertically integrated PBMs have the ability and incentive to prefer their own affiliated pharmacies to receive higher reimbursement rates from

pharmaceutical manufacturers. These practices have allowed pharmacies affiliated with the Big 3 to retain levels of dispensing revenue well above estimated drug acquisition costs. This has resulted in tremendous revenue spikes. Including, for example, nearly $1.6 billion of additional revenue on just two cancer drugs in under three years.[22]

115.    Despite the enormous power wielded by the Big 3, they operate without transparency or public accountability. Even though PBMs play a major role in the drug supply and payment chain, relatively little is known about their financial relationships with drug manufacturers and other entities in the prescription drug supply chain.

116.    In short, the Big 3 are gaming the healthcare system to maximize their profits at Payors' expense.

117.    Some of the various practices that the Big 3 use to generate tremendous profit include requiring rebates from pharmaceutical manufacturers in exchange for preferential or exclusive placement on the PBM's list of covered prescription drugs called a formulary, "spread pricing" or billing third-party payors more for a drug than is reimbursed to the pharmacy while retaining the delta for the PBM, demanding excessive administrative fees, allocating markets and customers through steering practices, and incentivizing distribution of drugs through affiliated mail order or retail pharmacies. Each of these schemes serve to exclude PBM competitors and buy off others in the distribution chain who would ordinarily push back on excess PBM profits if the distribution chain were truly competitive.

---

[22] FTC, INTERIM STAFF REPORT, PHARMACY BENEFIT MANAGERS: THE POWERFUL MIDDLEMEN INFLATING DRUG COSTS AND SQUEEZING MAIN STREET PHARMACIES 3 (July 2024) (hereinafter FTC FIRST INTERIM STAFF REPORT).

II.     **The PBM market's broad horizontal concentration and deep vertical integration make it extraordinarily susceptible to collusion.**

        A.      **Horizontal Concentration**

118.    The Big 3 manage 79% of all United States claims. This represents a sharp increase from the 52% of the market that the Big 3 held just twenty years ago.[23]

119.    Smaller PBMs often contract with larger PBMs for various services, further concentrating market power among the Big 3.[24]

120.    If each of the Big 3 PBMs were standalone companies, each would rank among the 40 largest companies in the United States by revenue. As one industry analyst observed, when the Big 3 PBMs' contracts with other PBMs are considered, "the brand and specialty market is effectively controlled by three players: CVS/AETNA, Cigna/ESI and UnitedHealth/OptumRx."[25]

121.    The Big 3 underwent mergers and acquisitions in the 2010s that contributed to their continually increasing market dominance. Specifically, Express Scripts acquired Medco Health Solutions in 2012 (combining the first and third largest PBMs by shares of claims managed), OptumRx acquired Catamaran in 2015 (combining the third and fourth largest PBMs with 13% and 9% shares of claims managed), and CVS Health merged with Aetna in 2018 (Aetna operated a PBM at the time, which increased CVS Caremark's share by five percentage points to 30%).[26]

122.    For further illustration, the healthcare conglomerates UnitedHealth Group, CVS Health, Cigna/Evernorth, and Humana wield a combined revenue of $1 trillion, which equals 22% of total health expenditures in the United States.[27] This is a sharp increase from 2016 when the

---

[23] *Id.* at 5.

[24] *Id.* at 13.

[25] *Id.* at 13-14.

[26] *Id.* at 15.

[27] *Id.* at 6.

combined revenue of these four healthcare conglomerates totaled $456 billion and equaled 2014 of total health expenditures in the United States. This rapid growth is attributable to recent mergers and acquisitions. These four conglomerates (which include the largest PBMs) collectively engaged in more than 190 transactions over the 2016 to 2023 period.[28]

123.    Mergers and acquisitions among the Big 3 PBMs' parent entities between 2000 and 2021 are shown below in a diagram prepared by Arkansas Attorney General, and included in the July 2024 FTC Interim Staff Report.[29]



## B.    Vertical Integration

124.    PBMs are vertically integrated with health insurers, health care providers, pharmacies, and drug private labelers, positioning PBMs in every role in the drug supply chain—

---

[28] *Id.* at 7.

[29] *Id.* at 8.

including price negotiator, formulary setter, payer, group purchasing organization, pharmacy, and drug manufacturer:[30]



**Figure 1. PBMs: Ownership and Vertical Integration**

| Parent/Owner | CVS Health Corporation | The Cigna Group | UnitedHealth Group Inc. | Humana Inc. | MedImpact Holdings Inc. | 19 BlueCross BlueShield plans |
|---|---|---|---|---|---|---|
| Drug Private Labeler | Cordavis Limited | Quallent Pharmaceuticals | NUVAILA | | | |
| Health Care Provider | MinuteClinic, Signify Health | Evernorth Care Group | Optum Health | CenterWell | | |
| Pharmacy Benefit Manager | CVS caremark — 34% | EXPRESS SCRIPTS — 23% | Optum Rx — 22% | Humana Pharmacy Solutions — 7% | MedImpact — 5% | PRIME THERAPEUTICS — 3% |
| "PBM GPO"/ Rebate Aggregator | Zinc Health Services | Ascent Health Services | Emisar Pharma Services | Ascent (via contract) | Prescient Holdings Group LLC | Ascent (minority owner) |
| Pharmacy - Retail | CVS Pharmacy | | | | | |
| Pharmacy - Mail Order | CVS Caremark Mail Service Pharmacy | Express Scripts Pharmacy | Optum Rx Mail Service Pharmacy | CenterWell Pharmacy | Birdi, Inc. | Express Scripts Pharmacy (via contract) |
| Pharmacy - Specialty | CVS Specialty Pharmacy | Accredo | Optum Specialty Pharmacy | CenterWell Specialty Pharmacy | Specialty by Birdi | Accredo (via contract) |
| Health Insurer | Aetna | Cigna Healthcare | UnitedHealthcare | Humana | | 19 BlueCross BlueShield plans |

125. Healthcare conglomerates are also generating increased levels of revenue from their vertically integrated affiliates. For example, a study by the Brookings Institution found that from 2016 to 2019, UnitedHealth Group's share of spending associated with its affiliates rose by more

---

[30] *Id.* at 6.

than 250% to 17% of the company's total spending, and CVS Health's share of affiliate spending increased more than five-fold to nearly 13% of total spending.[31]

126.    Moreover, there is significant common ownership of publicly traded shares of UnitedHealth Group and CVS Health, which can further reduce incentives of companies to compete. Common ownership can reduce competition by softening firms' incentives to compete, even absent any specific anticompetitive act or intent.[32]

### i.    Integration with Major Health Insurers.

127.    The Big 3 are vertically integrated with the largest health insurers in the country that offer fully-insured, administrative services only, and Medicare Part D plans. Some health insurers do not permit their clients to comparison shop for PBM services. Rather, the client must use the PBM affiliated with the health insurer. The Big 3 PBMs vertically integrated with the county's largest health insurers are summarized below:

(a)    **Aetna (CVS Caremark):** CVS Health acquired Aetna in 2018. Aetna is the third largest health insurer in the United States and provides coverage for 35 million members. In 2023, Aetna reported revenue of approximately $105.6 billion. Aetna offers medical, pharmacy, and other insurance plans in the commercial, Medicare Advantage, and Managed Medicaid Markets.

(b)    **Cigna (Express Scripts):** Cigna acquired Express Scripts in 2018. Cigna is the fourth largest health insurer nationally. Cigna's insurance segment, Cigna Healthcare, provides coverage for U.S. and international clients and customers, resulting in $51.2 billion in revenue in 2023. It has approximately 18.2 million members in the United States

---

[31] *Id.* at 8.

[32] *Id.* at 9.

and offers commercial and Medicare Advantage medical, pharmacy, and other insurance plans.

(c) **UnitedHealth Group (OptumRx):** UnitedHealth Group acquired OptumRx in 2005. UnitedHealth Group offers health insurance and related services through its United Healthcare subsidiary. With approximately $281.4 billion in revenue in 2023, United Healthcare is the largest health insurer in the country. United Healthcare provides commercial, Medicare, and Medicaid plans for 27.3 million members.

**ii.      Integration with Health Care Providers.**

128.    The Big 3 are part of healthcare conglomerates that are vertically integrated with health care provider groups that play a central role in prescribing medication to patients. They are:

(a) **CVS Health Services Segment (CVS Caremark):** CVS' Health Services Segment owns and operates various provider groups, including MinuteClinic and Signify Health. MinuteClinic is a network of walk-in clinics staffed by nurse practitioners and physician assistants who conduct routine medical checks, perform lab tests, and prescribe medications, among other services. With over 1,000 locations, MinuteClinic is the largest provider of walk-in clinics in the country. Signify Health, acquired by CVS Health in 2023, manages a network of more than 10,000 clinicians who perform in-home health evaluations to support insurer value-based care programs.

(b) **Evernorth Health Services (Express Scripts):** Cigna's Evernorth Health Services owns and operates providers of in-home care (including primary care, care coordination, and enablement services, virtual care (including primary care, urgent care, behavioral health care, and other services), and office-based primary care services. Additionally, Evernorth holds a minority stake in VillageMD, a network of primary care, specialty care, and urgent care providers that serve millions of patients across 26 markets.

(c) **OptumHealth (OptumRx):** UnitedHealth Group, through its Optum Health subsidiary, provides in-clinic care, home care, and behavioral health care among other services. In 2023, Optum Health reported $95.3 billion in revenue. Optum Health is the largest employer of physicians in the country with 90,000 employed or affiliated physicians—10% of all U.S. physicians—working in more than 2,200 facilities, and another 40,000 advanced practice clinicians.

### iii.  Integration with Private Drug Labelers.

129.    The Big 3's parent companies recently established offshore entities that partner with drug manufacturers to produce and package drugs under private label names ("Drug Private Labelers").[33] Specifically:

(a) **Cordavis Limited (CVS Caremark)**: CVS Health launched Cordavis Limited ("Cordavis") in September 2023. Headquartered in Ireland, Cordavis partners with drug manufacturers to "commercialize and/or co/produce" biosimilar products.[34] Cordavis is working with Sandoz, a division of Novartis, to jointly market and distribute Hyrimoz, a biosimilar for Humira (adalimumab), which is used to treat various autoimmune conditions, including rheumatoid arthritis.[35] After launching Hyrimoz in 2023, CVS Caremark removed AbbVie's branded Humira from its standard commercial formulary in April 2024, replacing it with its own Hyrimoz biosimilar and two other adalimumab

---

[33] "Private label distribution" refers to "commercial distribution of a drug under the label or trade name of a person who did not manufacture, repack, relabel, or salvage that drug." 21 C.F.R. § 207.1 (2021).

[34] *See* CVS Health Corp., Annual Report, at 9 (Form 10-K, 2023); *CVS Health Launches Cordavis*, CVS HEALTH (Aug. 23, 2023), https://www.cvshealth.com/news/pbm/cvs-health-launches-cordavis.html.

[35] *CVS Health Launches Cordavis*, CVS HEALTH (Aug. 23, 2023), https://www.cvshealth.com/news/pbm/cvs-health-launches-cordavis.html.

biosimilars.[36] This formulary swap led to a sharp increase in Hyrimoz's share of prescriptions, which jumped from 5% to 35% to 45% of adalumimab products within a month, even though the list price for Hyrimoz is not the lowest of the biosimilars. It is estimated that this move could add about $50 million to $100 million to CVS' adjusted operating income on an annual basis.[37] As Senator James Lankford noted in his request for information from CVS Health and CVS Caremark, "Instead of allowing for coverage of all of the lowest-cost biosimilar products on the market, incentivizing low costs and patient choice, CVS chose to cover the biosimilar that another CVS Health subsidiary, Cordavis, co-manufactured."[38]

(b)     **Quallent Pharmaceuticals (Express Scripts)**: Cigna established Quallent Pharmaceuticals ("Quallent") in 2021.[39] Based in the Cayman Islands, Quallent oversees manufacturing and quality processes for approximately 50 pharmaceutical products.[40]

---

[36] Joshua Cohen, *CVS Caremark's Policy Shift On Humira Biosimilars May Not Be What The Doctor Ordered*, FORBES (May 2, 2024), https://www.forbes.com/sites/joshuacohen/2024/05/02/cvs-caremarks-policy-shift-onhumira-biosimilars-may-not-be-what-the-doctor-ordered.

[37] *See* David Wainer, *Coming to a CVS Near You: A Store Brand Monoclonal Antibody*, WALL ST. J. (Apr. 29, 2024), https://www.wsj.com/health/pharma/cvs-biosimilar-drugs-production-08227182.

[38] Letter from Sen. James Lankford to Karen S. Lynch, Pres. and CEO, CVS Health, and David Joyner, Pres., CVS Caremark 1 (Feb. 1, 2024), https://www.lankford.senate.gov/wp-content/uploads/2024/02/2024-2-1-Senator-Lankford-Letter-to-CVS.pdf

[39] *About Us*, QUALLENT PHARMACEUTICALS, https://www.quallentpharmaceuticals.com/about-us (last visited Feb. 13, 2025); Adam J. Fein, *What's Behind CVS Health's Novel Vertical Integration Strategy for Humira Biosimilars*, DRUG CHANNELS (Sept. 6, 2023), https://www.drugchannels.net/2023/09/whats-behind-cvs-healths-novel-vertical.html.

[40] *See Quallent Pharmaceuticals Health LLC*, DUN & BRADSTREET, https://www.dnb.com/business-directory/company-profiles.quallent_pharmaceuticals_health_llc.68ad6598ccb1d4fd4cb256eff8e88028.html (last visited Feb. 13, 2025); *About Us*, QUALLENT PHARMACEUTICALS, https://www.quallentpharmaceuticals.com/about-us (last visited Feb. 13, 2025); *Products*,

Evernorth, a wholly owned subsidiary of Cigna, recently announced that its Accredo specialty pharmacy division will offer a biosimilar for Humira sourced through Quallent.[41]

(c)    **NUVAILA (OptumRx)**: OptumRx established Nuvaila in mid-2024 through its subsidiary in Ireland, Optum Health Solutions. According to Nuvaila's trademark application, Nuvaila engages in the procurement of pharmaceuticals as well as customer manufacture of pharmaceutical products and generic prescription drugs.[42] From January 1, 2025, Nuvaila will offer biosimilars of Stelara and Humira.[43]

130.    Vertical integration with drug private labelers allows the Big 3 to generate increased earnings from biosimilar manufacture, discounted prices for PBM-affiliated specialty pharmacies, increased prices for non-affiliated pharmacies, assurance of supply, and bargaining leverage in negotiations with biosimilar manufacturers.[44]

131.    Senators Ron Wyden and Sherrod Brown, in their letter to FTC's Lina Khan, voiced similar concerns: the co-manufacturing agreements with drug private labelers "are a veiled attempt by PBMs to control additional parts of the supply chain which has resulted in additional harm to

---

QUALLENT PHARMACEUTICALS, https://www.quallentpharmaceuticals.com/products (last visited Feb. 13, 2025).

[41] *See Evernorth Announces Humira Biosimilar Available at $0 Out of Pocket for Accredo Patients in June*, EVERNORTH HEALTH SERVS. (Apr. 25, 2024), https://www.evernorth.com/articles/evernorth-announces-humira-biosimilar-available-0-out-pocket-accredo-patients-june.

[42] U.S. Trademark Application Serial No. 98583378 (filed June 4, 2024); Adam J. Fein, *Drug Channels News Roundup, June 2024*, DRUG CHANNELS (June 25, 2024), https://www.drugchannels.net/2024/06/drug-channels-news-roundup-june-2024.html.

[43] *Pharmacy Passages Formulary Update*, OPTUM RX (Aug. 2024), https://www.optum.com/content/dam/o4-dam/resources/pdfs/forms/PharmacyPassages_Direct_August_2024_FINAL.pdf.

[44] FTC FIRST INTERIM STAFF REPORT at 29.

consumers in the form of fewer drug choices and higher drug costs."[45] The PBMs are able "to markup the cost of biosimilars and steer patients to their higher cost 'co-manufactured' products while limiting access to products from non-affiliated manufacturers."[46]

### iv. The Big 3's vertical integration extends to pharmacy dispensing of high-priced, specialty drugs.

132. PBMs now own the vast majority of pharmacies nationwide. PBMs make the largest share of their profits—55%—from their pharmacy businesses.[47]

133. Generally, prescription drugs are dispensed to patients through retail pharmacies, mail order pharmacies, or specialty pharmacies.

134. Retail pharmacies include chain pharmacies, independent pharmacies and pharmacies located in hospitals, clinics, long-term care facilities, and supermarkets. Small and mid-size independent pharmacies must work through PBMs and often contract with PBMs through a pharmacy services administrative organization. Additionally, one of the Big 3—CVS Caremark—has a significant network of affiliated retail pharmacies. From 2013 to 2022, the number of CVS pharmacies increased by 28%, while other retail pharmacies declined by 7% overall, and 10% in rural areas.[48]

135. While CVS Caremark is the only of the Big 3 PBMs that owns a network of retail pharmacies, each of the Big 3 is vertically integrated with both mail order and specialty

---

[45] Letter from Sen. Ron Wyden and Sen. Sherrod Brown to Lina Khan, Chair, FTC (Sept. 30, 2024), https://www.finance.senate.gov/imo/media/doc/093024_wyden_brown_letter_to_ftc_on_pbm_practices.pdf.

[46] *Id.*

[47] Nicole Longo, *PBMs using 340B program to drive profits at patients' expense*, PHARMA (Mar. 27, 2024), https://phrma.org/Blog/PBMs-using-340B-program-to-drive-profits-at-patients-expense.

[48] FTC FIRST INTERIM STAFF REPORT at 16.

pharmacies. Mail order pharmacies generally fill maintenance prescriptions that are taken regularly by patients with chronic illnesses, as well as patient-administered specialty drugs, that ship directly to patients.[49] The Big 3-affiliated mail order pharmacies now account for nearly three quarters of dispensing revenue from mail-order pharmacies.[50]

136. Similarly, the affiliated specialty pharmacies account for over two-thirds of specialty dispensing revenue.[51] From 2016 to 2023, specialty drugs have grown much faster than traditional drugs as a source of dispensing revenue for pharmacies. Total dispensing through mail order and specialty pharmacies grew over 50% from $393 billion in 2016 to $600 billion in 2023. This growth was disproportionately generated by specialty dispensing revenue which more than doubled from $113 billion in 2016 to $237 billion in 2023.[52]

137. Defendants' specialty dispensing shares have collectively increased while the market share between the Big 3 has remained remarkably consistent. In 2016, Defendants collectively accounted for almost 55% of market shares for specialty drug dispensing, which grew to over 67% by 2023.[53] Throughout that time, Defendants' respective market shares almost exclusively grew, with that growth coming at the expense of others, suggesting very little competition between Defendants:[54]

---

[49] *Id.* at 17.

[50] *Id.*

[51] *Id.* at 18.

[52] *Id.*

[53] *Id.* at 20

[54] *Id.*



138.    The growth of the specialty segment and the Big 3 PBM-affiliated specialty pharmacies growing share of the segment is driven in part by PBMs increasing the number of drugs they classify as "specialty," PBMs' involvement in specialty pharmacy merger and acquisition transactions, and PBMs' ability and incentive to steer patients to their vertically integrated, affiliated pharmacies and away from unaffiliated pharmacies, as well as the incentive to inflate the reimbursement rates paid to their affiliated pharmacies for certain specialty drugs.[55]

139.    The Big 3 PBMs that dispense specialty medications have benefited from this growth, significantly expanding their share of the specialty segment from 54% in 2016 to 68% in 2023, even as retail and mail order pharmacy shares remain relatively stable.

## III.    The Big 3 have an ongoing forum to collude.

### A.    The Big 3 dominate and regularly convene through the national association of PBMs.

140.    The Pharmaceutical Care Management Association (PCMA) is "the national association representing America's pharmacy benefit managers."[56] As of February 2025, eighteen

---

[55] FTC Complaint at 21.

[56] *About PCMA*, PCMA, https://www.pcmanet.org/about/ (last visited Feb. 13, 2025).

(18) PBMs are members of the PCMA, including the Big 3.[57]

141.    Since at least 2012, the PCMA has held multiple meetings annually for PBMs, pharmaceutical companies, and other industry partners to discuss scientific advancements, business strategies, and policy changes that could impact PBMs and their related businesses. The PCMA's two most important events are 1) the PCMA Annual Meeting, held every year since at least 2004,[58] and 2) the PCMA Business Forum (formerly the Specialty Pharmacy Business Forum and sPCMA Business Forum), started in 2012[59] and held every year except for 2020, when it was cancelled due to the COVID-19 pandemic.[60] The PCMA's Annual Meetings are "tailored specifically for senior executives from PBMs and their affiliated business partners – most notable drug manufacturers,"[61] while its Business Forums "offer invaluable networking" with "industry thought leaders"[62] and "executives from the largest specialty pharmacies and PBMs."[63] Topics at

---

[57] *Members*, PCMA, https://www.pcmanet.org/members/ (last visited Feb. 13, 2025).

[58] *PCMA Annual Meeting & Marketing Showcase 2004*, PCMA EVENTS, https://web.archive.org/web/20041010202654/http://www.pcmaevents.com:80/index.php?src=gendocs&link=HOME%20Annual%20Meeting%20October%202004&category=Annual%20Meeting%20October%202004 (last visited Feb. 13, 2025).

[59] *2012 Events*, PCMA https://web.archive.org/web/20121112020507/http://www.pcmanet.org/2012-events (last visited Feb. 13, 2025).

[60] *2013 Events*, PCMA, https://web.archive.org/web/20141015061223/http://www.pcmanet.org:80/2013-events/ (last visited Feb. 13, 2025); *Past Events*, PCMA, https://www.pcmanet.org/events/past-events/ (last visited Feb. 13, 2025).

[61] *PCMA Annual Meeting 2023*, PCMA, https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2023/ (last visited Feb. 13, 2025).

[62] *PCMA Annual Meeting 2021*, PCMA, https://www.pcmanet.org/events/past-events/spcma-business-forum-2021/ (last visited Feb. 13, 2025).

[63] *PCMA Annual Meeting 2023*, PCMA, https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2023/ (last visited Feb. 13, 2025).

PCMA meetings have included: "Rebate Contracting with Public and Commercial Payers,"[64] "The Impact of Healthcare Exchanges on Rebate Contracting,"[65] "The High Price Drug Debate,"[66] "What's Driving Formulary Exclusion Lists in Specialty,"[67] "Indication-Based Pricing in Oncology,"[68] "Strategic Insights and Priorities for the PBM Industry,"[69] "Specialty Innovation Cost Trends and Biosimilars: How to pay for innovation while managing drug cost trend,"[70] "The Future of Drug Discount and Rebate Negotiations,"[71] and "Value Based Contracting: Did We Accomplish What We Set Out to Do?"[72]

## B. Since 2012, the Big 3 have controlled the PCMA Board of Directors.

142. For over a decade, the Big 3 have dominated control of the PCMA Board.

143. CVS Caremark, Express Scripts, and OptumRx have all been represented on the PCMA Board of Directors every year since at least 2012.[73]  Additionally, twelve of the past

---

[64] *Managed Markets Educational Forum 2013*, PCMA, https://web.archive.org/web/20130213104858/http://pcmanet.org/events/25 (last visited Feb. 13, 2025).

[65] *Id.*

[66] PCMA, *sPCMA Business Forum 2017 Conference Program* 3 (Mar. 8–9, 2017).

[67] PCMA, *sPCMA Business Forum 2014 Conference Program* 27 (Mar. 12–13, 2014).

[68] PCMA, *sPCMA Business Forum 2016 Conference Program* 13 (Feb. 8–9, 2016).

[69] PCMA, *sPCMA Business Forum 2014 Conference Program* 12 (Mar. 12–13, 2014).

[70] PCMA, *PCMA Annual Meeting 2021 Newsletter* 3 (Aug. 27, 2021).

[71] PCMA, *PCMA Annual Meeting 2018 Conference Program* 2 (Sept. 24–25, 2018).

[72] PCMA, *sPCMA Business Forum 2019 Conference Program* 5 (Mar. 11–12, 2019).

[73] PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2011), https://projects.propublica.org/nonprofits/display_990/383676760/2012_11_EO%2F38-3676760_990O_201112; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2012), https://projects.propublica.org/nonprofits/display_990/383676760/ 2013_12_EO%2F38-3676760_990O_201212; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2013), https://projects.propublica.org/nonprofits /display_990/383676760/2014_11_EO%2F38-3676760_990O_201312; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2014), https://projects.propublica.org/nonprofits/display_990/383676760/2016_01_EO%2F13-

eighteen[74] Chairmen of the Board of the PCMA have been top-level executives from one of the

Big 3.[75] Two more Chairmen were representatives from PBMs that were later acquired by one of

125518_20004_383676760; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2015), https://projects.propublica.org/nonprofits/display_990/ 383676760/2017_02_EO%2F38-3676760_990O_201512; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2016), https://projects.propublica.org/ nonprofits/display_990/383676760/01_2018_prefixes_37-39%2F383676760_201612_ 990O_2018012915151488; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2017), https://projects.propublica.org/nonprofits/organizations /383676760/201822349349301017/full; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2018), https://projects.propublica.org/nonprofits/ display_990/383676760/01_2020_prefixes_38-39%2F383676760_201812_990O_ 2020010416996671; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2019), https://projects.propublica.org/nonprofits/display_990/383676760/06_ 2021_prefixes_38-41%2F383676760_201912_990O_2021060818289675; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2020), https://projects.propublica.org/nonprofits/organizations/383676760/20212313934930227/full; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2021), https://projects.propublica.org/nonprofits/organizations/383676760/202243089349300409/full; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2022), https://projects.propublica.org/nonprofits/organizations/383676760/202303189349313325/full; PCMA, Form 990: Return of Organization Exempt from Income Tax 7–8 (2023), https://projects.propublica.org/nonprofits/organizations/383676760/202443199349304014/full.

[74] Since 2011, multiple executives have served as Chairman twice and thus have been counted twice:

George Paz of Express Scripts served as Chairman in 2012 and 2016. *Board of Directors*, PCMA, https://web.archive.org/web/20120427112358/http://www.pcmanet.org:80/about-pcma/board-of-directors (last accessed Feb. 19, 2025); *Board of Directors*, PCMA, https://web.archive.org/web/20160106195119/http://www.pcmanet.org:80/about-pcma/board-of-directors (last accessed Feb. 19, 2025); PCMA, *PCMA Annual Meeting 2015 Conference Program* 36 (Sep. 21-22, 2025).

John Roberts of Caremark was Chairman in 2015 and 2020. PCMA, *PCMA Annual Meeting 2015 Conference Program* 36 (Sep. 21-22, 2025); *John Roberts of CVS Health Becomes PCMA Chairman of the Board*, PCMA, https://www.pcmanet.org/press-releases/jon-roberts-of-cvs-health-becomes-chairman-of-pcma-board-of-directors/09/26/2019/ (last accessed Feb. 19, 2025).

Tim Wentworth of Express Scripts was Chairman in 2016 and 2018. PCMA, *PBM Policy Forum 2016 Conference Program* 2 (Apr. 11, 2016); PCMA, *PCMA Annual Meeting 2018 Conference Program* 33 (Sep. 24-25, 2018).

[75] At least February 2011 through December 2011:

Per Lofberg, **CVS Caremark**. *Board of Directors*, PCMA, https://web.archive.org/web/20110226154138/ http://www.pcmanet.org/about-pcma/board-of-directors (last visited Feb. 18, 2025) (as of Feb. 2011); *Board of Directors*, PCMA https://web.archive.org/web/20111227011720/ http://www.pcmanet.org:80/about-pcma/board-of-directors (last visited Feb. 18, 2025) (as of Dec. 2011).

From January 2012 through March 2012: David B. Snow, Jr., Medco (Acquired by **Express Scripts** in April 2012). *Board of Directors*, PCMA, https://www.pcmanet.org/press-releases/prime-therapeutics-mostafa-kamal-becomes-pcma-board-chair/10/03/2024/, (last visited Feb. 18, 2025) (as of Jan. 2012); *Board of Directors*, PCMA, https://web.archive.org/web/20120314113124/ http://www.pcmanet.org:80/about-pcma/board-of-directors (last visited Feb. 18, 2025) (as of Mar. 2012).

From March 2012 through December 2012: George Paz, **Express Scripts.** *Board of Directors*, PCMA, https://web.archive.org/web/20120427112358 /http://www.pcmanet.org:80/about-pcma/board-of-directors (last visited Feb. 18, 2025) (as of Apr. 2012).

Throughout 2013: Mark Thierer, Catamaran (acquired by **OptumRx** in July 2015). *See Board of Directors*, PCMA, https://web.archive.org/web/20131030121831/ http://pcmanet.org/about-pcma/board-of-directors (last visited Feb. 18, 2025).

Throughout 2014: Dirk McMahon, **OptumRx**. PCMA, *sPCMA Business Forum 2014 Conference Program* (Mar. 12–13, 2014), https://www.pcmanet.org/wp-content/uploads/2016/10/2014_PCMA-PBM-Policy-Forum_Program-Book.pdf).

Throughout 2015: Jon Roberts, **CVS Caremark**. PCMA, *2015 Annual Meeting Conference Program* 36 (Sept. 21–21, 2016) https://www.pcmanet.org/wp-content/uploads/2016/10/2015_PCMA-Annual-Meeting_Program-Book.pdf.

From December 2015 through February 2016: George Paz, **Express Scripts**. *Board of Directors*, PCMA, https://web.archive.org/web/20151205152521/ http://www.pcmanet.org:80/about-pcma/board-of-directors (last visited Feb. 18, 2025) (as of Dec. 2015*); Board of Directors*, PCMA, https://web.archive.org/web/ 20160206065909/http://pcmanet.org/about-pcma/board-of-directors (last visited Feb. 18, 2025) (as of Feb. 2016).

From February 2016 through October 2016: Tim Wentworth, **Express Scripts**. *Board of Directors*, PCMA, https://web.archive.org/web/20160206065909/ http://pcmanet.org/about-pcma/board-of-directors (last visited Feb. 18, 2025) (as of Feb. 2016); *Board of Directors*, PCMA, https://web.archive.org/web/20161001021049 /http://www.pcmanet.org:80/about-pcma/board-of-directors (last visited Feb. 18, 2025) (as of Oct. 2016).

Throughout 2018: Tim Wentworth, **Express Scripts.** PCMA, *2018 Annual Meeting Conference Program* 33 (Sept. 24–25, 2018), https://www.pcmanet.org/wp-content/uploads/2018/11/2018_AM-Program_COMBINED_FINAL-2.pdf.

Throughout 2019: Jon Prince, **OptumRx.** PCMA, *sPCMA Business Forum 2019 Conference Program* 22 (Mar. 11–12, 2019), https://www.pcmanet.org/wp-content/uploads/2019/06/sPCMA_BF2019_program_FINAL.pdf)

the Big 3, including one who was Chairman for only three months before Express Scripts acquired his PBM and replaced him as Chairman with their own CEO.[76]

    144.    As of October 9, 2024, the PCMA Board of Directors included the following:[77]

- **CVS Caremark:** David Joyner President; CVS Health: Executive Vice President, and Chairman of the PCMA Board of Directors, October 2023-October 2024

- **Express Scripts:** Adam Kautzner, President; Evernorth Care Management: President

- **OptumRx:** Patrick Conway, CEO.

---

Throughout 2020: Jon Roberts, **CVS**. *John Robers of CVS Health Becomes Chairman of PCMA Board of Directors*, PCMA (Sept. 26, 2019), https://www.pcmanet.org/press-releases/jon-roberts-of-cvs-health-becomes-chairman-of-pcma-board-of-directors/09/26/2019/.

Throughout 2020: Alan Lotvin, **CVS**. PCMA, *sPCMA Business Forum 2020 Conference Program* 18 (Mar. 16–17, 2020), https://www.pcmanet.org/wp-content/uploads/2020/04/PCMA_BF2020_program_FINAL_singlepage-1.pdf.

Throughout 2023: Adam Kautzner, **Express Scripts.** *Express Scripts President Adam Kautzner Appointed Chair of PCMA Board of Directors*, PCMA (Feb. 3, 2023), https://www.pcmanet.org/press-releases/express-scripts-president-adam-kautzner-appointed-chair-of-pcma-board-of-directors/02/03/2023/.

Throughout 2024: David Joyner, **CVS**. Pharmaceutical Care Management Association, David Joyner Executive Vice President CVS Health and President CVS Caremark, and PCMA Chairman of the Board (Mar. 2024),.

[76] David B. Snow, Jr., CEO of Medco Health Solutions, was Chairman from January to March 2012. Medco was acquired by Express Scripts in April 2012, and George Paz, President and CEO of Express Scripts, became Chairman that same month. *See Board of Directors*, PCMA, *https://web.archive.org/web/20131030121831/http://pcmanet.org/about-pcma/board-of-directors* (last visited Feb. 19, 2025); *Board of Directors*, PCMA, https://web.archive.org/web/20120427112358/http://www.pcmanet.org:80/about-pcma/board-of-directors (last visited Feb. 19, 2025).

Mark Thierer, CEO of Catamaran, was Chairman in 2013. Catamaran was later acquired by Optum in June 2015. *See Board of Directors*, PCMA, https://web.archive.org/web/20131030121831/http://pcmanet.org/about-pcma/board-of-directors (last visited Feb. 19, 2025); Adam J. Fein, *OptumRx Sails Away with Catamaran: Deal Analysis and Industry Implication*, DRUG CHANNELS (Mar. 31, 2015).

[77] *Board of Directors*, PCMA, https://www.pcmanet.org/board-of-directors/ (last visited Oct. 9, 2024).

**C.** **Control of the PCMA's specialty drug division is also dominated by the Big 3.**

145.    The sPCMA is – or, until 2022,[78] was - a division of the PCMA focused on specialty pharmacy, particularly as it relates to public policy and industry relations.[79]

146.    PBMs are pursuing growth in the specialty pharmacy industry. In 2010, specialty pharmacies affiliated with the Big 6 earned around 36% of U.S. prescription revenues from specialty drugs.[80] By 2023, Big 6-affiliated pharmacies, particularly the Big 3, earned an estimated 70% of all specialty drug revenues,[81] with the Big 3 controlling approximately 80% of the specialty pharmacy market.[82] In 2018 alone, CVS Health acquired five specialty pharmacies, including the fourth-largest independent specialty pharmacy in the United States, while OptumRx purchased the largest private specialty pharmacy in the United States.[83] Notably, in 2023, specialty pharmacy M&A transactions reached the *lowest* annual total in the past five years, due in part to extensive

---

[78] *Past Events*, PCMA, https://www.pcmanet.org/events/past-events/ (last visited Feb. 19, 2025).

[79] *About Us*, sPCMA, https://web.archive.org/web/20160608043839/http://spcma.org/about-us (last visited Feb. 19, 2025).

[80] CVS Caremark was the largest earner with 25% of revenues, and Express Scripts (CuraScript) earned 11%. The second-largest earner, Medco (Accredo), was acquired by Express Scripts' parent company Evernorth in 2012. Adam J. Fein, *Pharmacy Market Share for Specialty Drugs, 2010*, DRUG CHANNELS (Dec. 2, 2011).

[81] CVS Specialty earned 30% of revenues, Accredo (now part of Evernorth) earned 24%, Optum Specialty Pharmacy earned 13%, and CenterWell Specialty Pharmacy (owned by Humana) earned 3%. Adam J. Fein, *The Top 15 Specialty Pharmacies of 2023: Market Shares and Revenues at the Biggest PBMs, Health Plans, and Independents*, DRUG CHANNELS (Apr. 16, 2024); FTC First Interim Staff Report at 2.

[82] Kate Humphrey, LEVINPRO HC, *The Durability of the Specialty Pharmacy M&A Market* 3 (2023).

[83] According to Drug Channels Institute, in 2018, CVS Health acquired Apothecary By Design (ABD), the fourth-largest independent specialty pharmacy, along with four other specialty pharmacies. OptumRx acquired Avella Specialty Pharmacy for a reported purchase price of $325 million. Adam J. Fein, *Specialty Pharmacy M&A: Our Look at 2018's Deals*, DRUG CHANNELS (Jan. 3, 2019).

market consolidation, resulting in fewer acquisition opportunities.[84] Meanwhile, the total size of the specialty pharmacy industry has increased exponentially, from earning a total of $39.2 billion in specialty drug revenue in 2010[85] to $243.3 billion in 2023.[86] Specialty drugs made up half of *all* drug spending in the United States in 2021.[87]

147. Almost every year between at least 2014 and 2020,[88] executives from all three of the Big 3 PBMs were on the sPCMA Board of Directors.[89] Not only were the Big 3 consistently represented in the PCMA's specialty pharmacy division, *all* non-Big 6 Board members were executives from entities which eventually became a parent, subsidiary, or affiliate of one of the Big 3.[90]

---

[84] Kate Humphrey, LEVINPRO HC, *The Durability of the Specialty Pharmacy M&A Market* 3 (2023). ("[I]n 2023, the deal volume [of M&A transactions in the specialty pharmacy industry] has not lived up to the activity of prior years. Through the first three quarters of 2023, there have been 13 transactions in the specialty, which, annualized, was the lowest annual total over the past five years. ***This is partly because the market is already so consolidated that there are not as many acquisition opportunities***.") (emphasis added).

[85] Adam J. Fein, *Pharmacy Market Share for Specialty Drugs, 2010*, DRUG CHANNELS (Dec. 2, 2011).

[86] Adam J. Fein, *The Top 15 Specialty Pharmacies of 2023: Market Shares and Revenues at the Biggest PBMs, Health Plans, and Independents*, DRUG CHANNELS (Apr. 16, 2024).

[87] OFFICE OF SCIENCE & DATA, ASPE, HHS POLICY ISSUE BRIEF TRENDS IN PRESCRIPTION DRUG SPENDING 2016-2021 1 (Sep. 2022), https://aspe.hhs.gov/sites/default/files/documents/88c547c976e915fc31fe2c6903ac0bc9/sdp-trends-prescription-drug-spending.pdf.

[88] Except for 2015, for which the list of sPCMA Board members was not found.

[89] PCMA, *sPCMA Business Forum 2014 Conference Program* 3 (Mar. 12-13, 2014); PCMA, *sPCMA Business Forum 2016 Conference Program* 3 (Feb. 8-9, 2016); PCMA, *sPCMA Business Forum 2017 Conference Program* 54 (Mar. 8-9, 2017); PCMA, *sPCMA Business Forum 2018 Conference Program* 56 (Mar. 5-6, 2018); *About Us*, sPCMA, https://web.archive.org/web/20190102193156/https://www.spcma.org/about-spcma/ (last visited Feb. 19, 2025); *About Us*, sPCMA, https://web.archive.org/web/20200215213846/https://www.spcma.org/about-spcma/ (last visited Feb. 19, 2020).

[90] *Id.*

**The Big 3 regularly convene through the PCMA, including routine private meetings.**

148.    The PCMA has held between two to four conferences annually since at least 2012. These conferences include the PCMA Annual Meeting, PCMA (formerly sPCMA) Business Forum, PBM Policy Forum, PBM Summit, and Managed Markets Education Forum. The two primary conferences, the Annual Meeting and Business Forum, have been held every year since at least 2004 and 2012, respectively. The PCMA describes its Annual Meeting as "the industry's premier executive conference…tailored specifically for senior executives from PBMs and their affiliated business partners,"[91] which "provides an un-matched and ideal venue for senior executives from PBMs, specialty pharmacy, payer organizations, and pharmaceutical manufacturers to network, conduct business and learn about the most current issues impacting the industry."[92] Additionally, the PCMA began the Specialty Pharmacy Business Forum in 2012,[93] later changing the event's name first to the sPCMA Business Forum in 2014[94] and then simply to the PCMA Business Forum in 2022.[95] These meetings are attended by "decision makers" and

---

[91] *2024 PCMA Annual Meeting*, PCMA, https://www.pcmanet.org/events/past-events/2024-pcma-annual-meeting/ (last visited Feb. 19, 2025).

[92] *Annual Meeting 2017*, PCMA, https://www.pcmanet.org/events/past-events/annual-meeting-2017/ (last visited Feb. 19, 2025).

[93] *2012 Events*, PCMA, https://web.archive.org/web/20121112020507/http://www.pcmanet.org/2012-events (last visited Feb. 19, 2025).

[94] *Past Events*, PCMA, https://www.pcmanet.org/events/past-events/ (last visited Feb. 19, 2025).

[95] *Id.* Prior to 2012, the PCMA had hosted several conferences dedicated to specialty pharmacy, namely its Specialty Pharmacy Symposium, which was held annually from 2004 to 2008, and the PBM and Specialty Pharmacy Summit, which was held in 2011. *See Past Events*, PCMA, https://web.archive.org/web/20051210231622/http://pcmanet.org/events/pevents.htm (last visited Feb. 19, 2025); *Events*, PCMA, https://web.archive.org/web/20061006022050/http://www.pcmanet.org/events/index.htm (last visited Feb. 19, 2025); *Events*, PCMA, https://web.archive.org/web/20080229044924/http://www.pcmanet.org/events/index.htm (last visited Feb. 19, 2025); *PBM & Specialty Pharmacy Summit Conference Information*, PCMA,

"thought leaders"[96] and are "designed…to be an important part of [PBMs'] business strategy..."[97] offering "invaluable networking, timely and though-provoking educational sessions."[98]

149.    At the inaugural Specialty Pharmacy Business Forum in 2012, the PCMA launched PCMA-Connect, an "invitation-only LinkedIn Group and online networking community for PCMA's PBM Members, Affiliates, and registered conference attendees" designed to give members "year-round access" to PBM Members and affiliates as well as "month-long access around each conference" to registered conference attendees.[99] The PCMA "encourage[s] all [conference] attendees to join/use PCMA-Connect to contact other Group members and to schedule meetings before arriving at the conference."[100]

---

https://web.archive.org/web/20120314115438/http://www.pcmanet.org/events/19#agenda (last visited Feb. 19, 2025).

96 *sPCMA Business Forum 2021*, PCMA, https://www.pcmanet.org/events/past-events/spcma-business-forum-2021/ (last visited Feb. 19, 2025).

[97] *2024 PCMA Annual Meeting*, PCMA, https://www.pcmanet.org/events/past-events/2024-pcma-annual-meeting/ (last visited Feb. 19, 2025).

[98] *2024 PCMA Business Forum*, PCMA, https://www.pcmanet.org/events/past-events/2024-pcma-business-forum/ (last visited Feb. 19, 2025).

[99] *PCMA-Connect,* PCMA,
https://web.archive.org/web/20131030142601/http:/pcmanet.org/pcma-connect (last visited Feb. 19, 2025).

[100] *PCMA-Connect*, PCMA,
https://web.archive.org/web/20130314062301/http://www.pcmanet.org:80/pcma-connect (last visited Feb. 19, 2025).

150.    The Big 3 PBMs have had at least one speaker at the PCMA Annual Meeting almost

every year since 2011[101] and at least one speaker at the Business Forum[102] almost every year since

[101] *Conference Information: Annual Meeting*, PCMA,
https://web.archive.org/web/20160304233356/http://pcmanet.org/events/20 (last visited Feb. 19,
2025) (relating to the October 2011 Annual Meeting); *Conference Information: PCMA Annual
Meeting 2012*, PCMA, https://web.archive.org/web/20160305053416/ http://pcmanet.org/2012-
annual-meeting (last visited Feb. 19, 2025); *Conference Information: PCMA Annual Meeting
2013*, PCMA, https://web.archive.org/web/ 20160411024434/http://pcmanet.org/events/28 (last
visited Feb. 19, 2025); *Conference Information: 2014 PCMA Annual Meeting*, PCMA,
https://web.archive.org/web/ 20160304170242/http://pcmanet.org/events/32 (last visited Feb. 19,
2025); *Conference Information: 2015 PCMA Annual Meeting*, PCMA,
https://web.archive.org/web/ 20160305121726/http://pcmanet.org/events/35 (last visited Feb. 19,
2025); *Conference Information: 2016 PCMA Annual Meeting*, PCMA,
https://web.archive.org/web/ 20160808163549/http://www.pcmanet.org:80/events/38; PCMA,
*Annual Meeting 2017 Conference Program* 2-4 (Sept. 25–26, 2017);  PCMA, Annual Meeting
2018 Conference Program 2–4 (Sept. 24–25, 2018); *PCMA Annual Meeting 2019*, PCMA,
https://web.archive.org/web/20210227072359/https://www.pcmanet.org/events/past-
events/pcma-annual-meeting-2019/ (last visited Feb. 19, 2025); *PCMA Annual Meeting 2020:
Agenda*, PCMA, https://web.archive.org/web/20201024233002/ https://www.pcmanet.org/pcma-
event/annual-meeting-2020/agenda/ (last visited Feb. 19, 2025); *Agenda*, PCMA
https://web.archive.org/web/20240626160858/ https://www.pcmanet.org/pcma-event/annual-
meeting-2021/agenda/ (last visited Feb. 19, 2025) (relating to the September 2021 Annual
Meeting); Newsletter: PCMA Annual Meeting 2022, Issue #2, 1–2 (Sep. 15, 2022),
https://www.pcmanet.org/wp-content/uploads/2022/09/PCMA_AM2022_newsletter_Second-
Edition-Final-Attendee-Details.pdf; *PCMA Annual Meeting: 2023 Speakers*, PCMA,
https://www.pcmanet.org/ pcma-event/annual-meeting-2024/speakers/ (last visited Feb. 19,
2025).

[102] *Conference Information: Specialty Pharmacy Business Forum 2012*, PCMA,
https://web.archive.org/web/20160306002257/http://pcmanet.org/2012-business-forum (last
visited Feb. 19, 2025); *Conference Information: Specialty Pharmacy Business Forum 2012*,
PCMA, https://web.archive.org/web/20160305121720/http://pcmanet.org/events/27 (last visited
Feb. 19, 2025); *Conference Information: 2014 sPCMA Business Forum*, PCMA,
https://web.archive.org/web/20160305182137/ http://pcmanet.org/events/31 (last visited Feb. 19,
2025); *Conference Information: 2015 sPCMA Business Forum*, PCMA,
https://web.archive.org/web/20160322145212/ http://pcmanet.org/events/34 (last visited Feb. 19,
2025); PCMA, *sPCMA Business Forum 2016 Conference Program* 13–42 (Feb. 8–9, 2016);
PCMA, *sPCMA Business Forum 2017 Conference Program* 2–6 (Mar. 8–9, 2017); PCMA,
*sPCMA Business Forum 2018 Conference Program* 2–7 (Mar. 5–6, 2018); PCMA, *sPCMA
Business Forum 2019 Conference Program* 3–7 (Mar. 11–12, 2018); PCMA, *sPCMA Business
Forum 2020 Program* 3–9 (Mar. 16–17, 2020); *New Four Day Format*, PCMA,
https://web.archive.org/web/20230603053011/https://www.pcmanet.org/pcma-event/ 2021-
spcma-business-forum/agenda-2/ (last visited Feb. 19, 2025) (relating to the February 2021
Business Forum); *PCMA Business Forum 2022: Speakers*, PCMA,

2012. These often include joint sessions between the PBMs.[103] Highlight videos from these conferences, as well as select session recordings, are posted on the PCMA's Vimeo channel, which was started in January 2012.[104]

151.    Not only do these conferences provide a forum in which PBMs gather publicly to discuss topics such as pricing, rebates, and formulary schemes, the PCMA also expressly set aside time and space in their agendas for *private* meetings. During these private sessions, these PBMs meet to further their anticompetitive schemes, with the endorsement and encouragement of the PCMA.

152.    At every Annual Meeting since at least 2009, the PCMA has provided a block of time labelled "Open Time for Private Meetings," "Free Time for Private Meetings," or simply "Private Meeting Time."[105] Since 2014, both the Annual Meeting and Business Forum have kept private meeting rooms open all day of the duration of the conference.[106] The Big 3 are often assigned rooms, and participants must schedule their private meeting in advance through the PCMA. At the 2012 Business Forum, for example, the PCMA provided attendees with "35+ private meeting facilities" and "over 11 hours of time during the [Forum] to conduct business

---

https://web.archive.org/web/20230203125126/https://events.pcmanet.org/pcma-event/ 2022-pcma-business-forum/speakers/ (last visited Feb. 19, 2025); *PCMA Business Forum 2013: Agenda*, PCMA, https://web.archive.org/web/20230205010341/ https://www.pcmanet.org/pcma-event/2023-pcma-business-forum/agenda/ (last visited Feb. 19, 2025).

[103] *Id.*

[104] *PCMA*, Vimeo, https://vimeo.com/user9967667 (last accessed Feb. 19, 2025).

[105] *Conference Information - PCMA's Annual Meeting* (2009), PCMA, https://web.archive.org/web/20111020025837/http://www.pcmanet.org:80/events/13 (last visited Feb. 19, 2025).

[106] *See supra, n.96*

meetings."[107] In 2013 and 2014, the Annual Meeting Agenda included time for "private dinners;" in 2021 and 2022, the PCMA Board of Directors hosted "invitation-only" receptions. Even in 2020, when the Annual Meeting was held online, the PCMA kept virtual meeting rooms open for participants. Additionally, both the Annual Meeting and the Business Forum held manufacturer-exclusive "Member Company Breakfast and Lunch Receptions," in which manufacturer attendees can network with PBMs and their affiliates in designated rooms. The Big 3 regularly use the PCMA's digital tools to communicate privately.

153.     PBMs communicate privately through the PCMA's exclusive online platforms. These platforms include the Member's Area on the PCMA Website, with "tools and documents" only available to PCMA members,[108] and the PCMA Industry Relations Hub, which provides a database of PCMA conference attendee contacts as well as a content library with "[r]ecorded PCMA conference sessions, webinars, breakouts, and more."[109] Only PCMA Members and PCMA Sponsors have access to the Industry Relations Hub. During PCMA conferences, participants can communicate with one another on their mobile devices through the official conference app.[110]

154.     Additionally, as mentioned above, the PCMA provides PCMA-Connect, "an invitation-only LinkedIn Group and online networking community for PCMA members, affiliates, and registered conference attendees."[111] PCMA-Connect "enable[es] participant-to-participant

---

[107] *Conference Information – Specialty Pharmacy Business Forum 2012*, PCMA, https://web.archive.org/web/20160306002257/http://pcmanet.org/2012-business-forum#agenda (last visited Feb. 19, 2025).

[108] *Member Area*, PCMA, https://www.pcmanet.org/member-login-2/ (last visited Feb. 19, 2025).

[109] *PCMA Industry Relations Hub*, PCMA, https://irhub.pcmanet.org/member-login/ (last visited Feb. 19, 2025).

[110] PCMA, *PCMA Annual Meeting 2019 Conference Program* 16 (Sep. 23-24, 2019).

[111] *PCMA-Connect*, PCMA, https://www.pcmanet.org/contact/pcma-connect/ (last visited Feb. 19, 2025).

connections,"[112] allowing members to "build a detailed personal profile", "perform targeted searches for people and companies based on a number of criteria," and even "pre-schedule onsite meetings" with fellow PBMs at PCMA conferences.[113] PCMA's website highlights that PCMA-Connect allows users to "message with other group members and coordinate meetings" as well as "start online discussions about hot industry topics…"[114] PCMA-Connect provides Defendants with a private online forum in which to collude and unlawfully fix prices.

## IV. The Big 3 employ multiple schemes to garner profit well-above competitive levels.

155.    The Big 3 require drug manufacturers to provide large rebates to obtain favorable formulary placement in addition to demanding that drug manufacturers pay excessive fees for administration of those rebate programs and other services. These rebates and fees solicited by Defendants are payments other than for services rendered, *i.e.*, commercial bribes and kickbacks.

156.    Defendants also engage in a practice known as "spread pricing," in which they reimburse pharmacies less for drugs than what they charge to health plans to retain the profit.

157.    156.    Further, Defendants employ "optimization levers" to steer patients to Big 3-affiliated pharmacies and away from unaffiliated, independent pharmacies.

158.    Each of these practices built around the Big 3's rebate schemes are increasing the price of prescription drugs and restricting market competition.

---

[112] *Id.*

[113] *Conference Information - Specialty Pharmacy Business Forum 2012*, PCMA, https://web.archive.org/web/20160514054718/http://pcmanet.org/2012-business-forum#agenda (last visited Feb. 19, 2025).

[114] *PCMA-Connect*, PCMA, https://www.pcmanet.org/contact/pcma-connect/ (last visited Feb. 19, 2025).

## A. Formularies

159. One of the key ways PBMs exert influence over drug pricing and purchasing decisions is through creation and manipulation of drug formularies.[115]

160. A drug formulary is a list of prescription drugs covered by third-party payors' health plan. Formularies often separate drugs into multiple tiers, and drugs on "preferred" tiers are typically cheaper for patients. For example, a common formulary design has three tiers: tier 1 includes mostly generic drugs and has the lowest patient out-of-pocket cost; tier 2 includes preferred branded drugs with a higher out-of-pocket cost; and tier 3 includes non-preferred branded drugs with the highest patient out-of-pocket cost. This formulary design drives prescriptions toward the lowest tiers, including generic or preferred branded drugs.[116]

161. Drugs listed on a formulary are typically less expensive for a plan beneficiary to purchase, since they are subject to the plan's drug benefit.[117]

162. Some drug formularies are more "open," meaning the formulary covers all or nearly all medications. Other formularies are relatively "closed," meaning the formulary includes only certain drugs, and excludes others, used to treat a specific condition. Generally, a third-party payor will not reimburse any part of the cost for an excluded drug. It follows that a physician is more likely to prescribe a drug that is covered on their patient's health plan formulary. Thus, a drug's formulary coverage dramatically impacts the drug's cost and utilization.[118]

---

[115] FTC Complaint at 32.

[116] FTC Complaint at 32.

[117] SENATE FINANCE COMMITTEE, U.S. SENATE, STAFF REPORT: INSULIN: EXAMINING FACTORS DRIVING THE RISING COST OF A CENTURY OLD DRUG 34 (2021) (hereinafter SENATE INSULIN REPORT).

[118] FTC Complaint at ¶ 33.

163.     Drugs that are excluded from a formulary are not covered by insurance. If a patient needs a drug excluded from their health plan's PBM-developed formulary, the patient may be responsible for paying for the drug out of pocket.

164.     The Big 3 all offer several standard commercial formularies with different drug exclusion levels, ranging from open to more closed. The most-utilized commercial formularies all have a significant number of drug exclusions.[119]

165.     The Big 3's formularies are developed through formulary development committees comprised of PBM personnel that meet often—sometimes monthly—to make formulary placement decisions. Such placement decisions involve the impact of rebates if drugs are moved to different tiers, net costs, and wholesale acquisition costs ("WAC").[120]

166.     For example, OptumRX's Formulary Management Committee presentation stated that "[t]he basil insulin class was evaluated as part of 2019 recontracting [*sic*] effort to leverage competition and reduce the overall cost of the category," stresses the need for a "[r]eevaluation of the Humalog brand…to address market dynamics…[and mentions with respect to Humalog that] [a]dditional rebate opportunities [are] available for the various benefit designs."[121]

167.     Because formularies serve a crucial role in determining patient access to prescription drugs, PBMs' central role in formulary design gives them significant leverage to extract price concessions from drug manufacturers. If a PBM excludes a drug from its formulary, the manufacturer risks losing a significant portion of sales among patients covered by that formulary. Conversely, if a PBM "preferences" or "prefers" a drug by placing it on a more

---

[119] FTC Complaint at ¶ 34.

[120] SENATE INSULIN REPORT at 36-37.

[121] SENATE INSULIN REPORT at 37.

favorable tier compared to competing products, it can boost the drug's sales volume and market share.[122]

168.    The Big 3 use formulary development committees, which are generally comprised of employees from across a range of functional areas, to determine formulary drug placements. While these committees review clinical recommendations made by another committee (the pharmacy and therapeutics committee), the PBMs also take into account business considerations and make formulary determinations to maximize profits.[123]

169.    Formulary designs can preference PBMs' affiliated pharmacies, even if an unaffiliated pharmacy provides third-party payors with the same drugs at a better price. Formulary designs can also preference drugs for which drug manufacturers are willing to offer rebates to the PBMs.[124]

170.    Because third-party payors frequently outsource drug coverage decisions to PBMs, PBMs themselves create the drug formularies and place drugs on various formulary tiers.[125] PBMs then often require third-party payors to adopt minimum copay or coinsurance differentials between formulary tiers.

171.    Drug manufacturers' access to PBM formularies is essential for drug manufacturers to effectively sell their products.

172.    As Eli Lilly explained to its investors in 2019, failing to secure formulary placement can "lead to reduced usage of a drug for the relevant patient population due to coverage restrictions, such as prior authorizations and formulary exclusions, or due to reimbursement limitations which

---

[122] FTC Complaint at ¶ 38.

[123] FED. TRADE COMM'N, Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies, Interim Staff Report, (July 2024) at 10.

[124] *Id.* at 10.

[125] FTC Complaint at ¶ 72.

result in higher consumer out-of-pocket cost, such as non-preferred co-pay tiers, increased co-insurance levels, and higher deductibles."[126]

173.    In order to make it on to Big 3 formularies, drug manufacturers are forced to offer significant rebates to the Big 3.

## B.    Rebates

174.    The Big 3 exert influence over drug pricing and purchasing decisions by conditioning preferential formulary placement on rebates from drug manufacturers.[127]

175.    The Big 3 PBMs require drug manufacturers to pay rebates for drugs purchased by patients covered under third-party payors' health plans. Those rebates are based on a percentage of the WAC of each drug. Meaning that, the more expensive a drug is, the larger the rebate the manufacturer will have to pay to the PBM when a patient purchases that drug. The Big 3's rebate scheme that ties the size of rebates to a drug's WAC incentivizes the Big 3 to prioritize higher priced drugs and incentives increased WACs that yield larger rebates.

176.    Although drug manufacturers technically set WAC prices, this price is heavily influenced by PBMs required rebates. The WAC is often referred to as the drug's "list price."[128]

177.    The list price of a drug minus any rebates and fees paid by the manufacturer is referred to as the drug's "net price."[129]

178.    Generally, competition drives down prices. But since PBMs prioritized negotiating rebate amounts over net prices, manufacturers must *increase* WAC prices to offer larger rebates necessary to secure formulary access.[130]

---

[126] Eli Lilly and Co., Form 10-K (FY 2019), at 35.

[127] FTC Complaint at ¶ 39.

[128] FTC Complaint at ¶ 40.

[129] FTC Complaint at ¶ 41.

[130] FTC Complaint at ¶ 125.

179. PBMs retain a portion of rebates, creating incentives to prioritize profit over patient affordability and access.

180. PBMs often select higher-cost drugs for their formularies, even when lower-cost, equally effective alternatives are available.[131]

181. PBMs have little incentive to include cheaper competing drugs on their formularies because doing so would reduce the overall rebates they collect. If a PBM cannot guarantee that enough patients will switch to the lower-cost drug, the financial advantage of maintaining the original rebate arrangement outweighs the potential savings from competition.[132] This leads to increased costs for Payors.[133]

---

[131] Rebecca Robbins & Reed Abelson, *The Middlemen: The Opaque Industry Secretly Inflating Prices for Prescription Drugs*, NY TIMES (June 21, 2024), https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html ("Even when an inexpensive generic version of a drug is available, P.B.M.s sometimes have a financial reason to push patients to take a brand-name product that will cost them much more. For example, Express Scripts typically urges employers to cover brand-name versions of several hepatitis C drugs and not the cheaper generic versions."); COMMITTEE ON OVERSIGHT AND REFORM, U.S. HOUSE, A VIEW FROM CONGRESS: ROLES OF PHARMACY BENEFIT MANAGERS IN PHARMACEUTICAL MARKETS 9 (Dec. 10, 2021), https://oversight.house.gov/wp-content/uploads/2021/12/PBM-Report-12102021.pdf.

[132] Statement of Commissioner Rohit Chopra regarding the Commission's Report on Pharmacy Benefit Manager Rebate Walls (May 28, 2021), https://www.ftc.gov/system/files/documents/public_statements/1590528/statement_of_commissioner_rohit_chopra_regarding_the_commissions_report_on_pharmacy_benefit_manager.pdf; https://www.americanbar.org/groups/antitrust_law/resources/magazine/2024-spring/scaling-the-rebate-wall/; Peter C. Herrick & Monsura A. Sirajee, *Scaling the "Rebate Wall": Growing Scrutiny of Rebate Contracting in Pharma and Potential Responses*, ANTITRUST, Spring 2024, at 63, https://www.americanbar.org/content/dam/aba/publications/antitrust/magazine/2024/vol-38-issue-2/scaling-the-rebate-wall.pdf.

[133] Committee on Oversight and Accountability, U.S. House, Staff Report: The Roles of Pharmacy Benefit Managers in Prescription Drug Markets 4 (2024), https://oversight.house.gov/wp-content/uploads/2024/07/PBM-Report-FINAL-with-Redactions.pdf.

182.     Compounding this issue, manufacturers often raise the list prices of their drugs to offset the large rebates demanded by PBMs.[134]

183.     Meanwhile, PBMs often do not pass a significant portion of their savings on to patients or third-party payors.[135]

184.     These PBM rebate practices have led to the proliferation of "rebate walls" (also called "rebate traps"). A rebate wall occurs when a manufacturer offers substantial rebates to PBMs in exchange for exclusive or preferred formulary placement. Placement on a preferred formulary tier can significantly increase patient access to a drug, incentivizing manufacturers to secure such positions.[136]

185.     This rebate scheme was made ubiquitous by the Big 3. Drug manufacturers no longer have an option of whether or not to offer rebates but must offer them. This forces

---

[134]A VIEW FROM CONGRESS, at 10 ("Despite dramatically increasing rebates, the cost of prescription drugs have risen three times faster than inflation over the past decade even after the discounts provided to PBMs."); Neeraj Sood et al., *The Association Between Drug Rebates and List Prices*, USC SCHAEFFER (Feb. 11, 2020), https://healthpolicy.usc.edu/research/the-association-between-drug-rebates-and-list-prices/ ("On average, a $1 increase in rebates is associated with a $1.17 increase in list price.").

[135] Alex Schirver, *PhRMA launches new ad calling for Congress to make sure savings go to patients, not PBMs*, PhRMA (Nov. 10, 2024), https://phrma.org/Blog/PhRMA-launches-new-ad-calling-for-Congress-to-make-sure-savings-go-to-patients-not-PBMs; Ge Bai et al., *Policy Options To Help Self-Insured Employers Improve PBM Contracting Efficiency*, HealthAffairs (May 29, 2019), https://www.healthaffairs.org/content/forefront/policy-options-help-self-insured-employers-improve-pbm-contracting-efficiency.

[136] Neeraj Sood et al., *The Association Between Drug Rebates and List Prices*, USC Schaeffer (Feb. 11, 2020), https://healthpolicy.usc.edu/research/the-association-between-drug-rebates-and-list-prices/ ("Because the PBM market is highly concentrated, with three companies serving approximately 80 percent of the market, manufacturers face high stakes when negotiating for formulary placement. If one of the three dominant PBMs excludes their drug, they lose access to a large share of the market, making it all the more important to avoid exclusion from the other two PBMs' formularies. Offering higher rebates is an important lever that manufacturers can use to reduce the chance of being excluded. This dynamic can drive the perverse result in which PBM formularies favor drugs that offer higher rebates over similar drugs with lower net costs and lower rebates.")

manufacturers to increase WAC prices, and prohibits them from lowering WAC prices, in order to meet the Big 3 demands for rebates to achieve formulary placement.[137]

186. For example, in response to pressure from the Federal Government to reduce WAC prices, Eli Lilly raised concerns that PBMs, including OptumRx, would object to a lower WAC price for insulin because it would result in a reduction of rebates and administrative fees for PBMs that are both tied to WAC price.[138]

187. The practical effect is that instead of competition being driven by drug manufacturers offering lower prices to obtain access to formularies, drug prices were driven up because, in order to remain profitable while offering high rebates required by PBMs, drug manufacturers were forced to raise drug costs.[139]

188. Previously, the Big 3 negotiated rebate prices directly with drug manufacturers.

189. However, in recent years and in response to rebate transparency demands, PBMs began relocating rebate-negotiation responsibilities to separate entities to further safeguard commercial rebate contracting details from being made public. All of the Big 3 PBMs have created rebate aggregators which they call group purchasing organization ("rebate aggregators") to negotiate commercial rebates with drug manufacturers.[140] These rebate aggregators (Zinc Health, Ascent Health, and Emisar) perform the same commercial contracting function that PBMs previously handled directly. These PBMs simply moved their commercial rebate contracting functions to the rebate aggregators' corporate structure, while the rebate aggregators are still led

---

[137] SENATE INSULIN REPORT at 79.

[138] *Id.*

[139] FTC Complaint at ¶¶ 125, 128

[140] As the FTC notes, the PBMs refer to these entities as GPOs but these entities "do not perform traditional GPO functions." July 2024 FTC Rpt. 11, n.35., 21-23. For this reason, Plaintiffs use the more accurate descriptor: "rebate aggregators."

by PBMs. Now, rebate aggregators enter into commercial rebate contracts with drug manufacturers, and the PBMs utilize these rebate rates for their commercial clients.

190.    Express Scripts created, and contracts through, the Ascent Health Services rebate aggregator.[141]

191.    OptumRx created, and contracts through, the rebate aggregator Emisar Pharma Services.[142]

192.    CVS Caremark created, and contracts through, the rebate aggregator Zinc Health Services.[143]

193.    These negotiations can be of such great financial importance to the pharmaceutical companies that senior executives, up to and including the CEO, are often personally involved in the process.[144]

194.    Through rebate aggregators, the Big 3 solicit rebate bids from pharmaceutical manufacturers. Generally, manufacturers are willing to pay PBMs higher rebates for more preferential and/or exclusive treatment on the PBMs' drug formularies.

**C.    The Big 3 rebate scheme creates an anti-competitive market.**

195.    The Big 3 could pass on savings negotiated in the form of rebates to third-party payors and patients. Instead, they retain a disproportionate share of profits for themselves, contributing to the rising cost of prescription drugs.

---

[141]NAVLIN Insights Team, *Peeking Behind the PBM-lead GPO Curtain*, EVERSANA (Apr. 13, 2023), https://www.eversana.com/insights/peeking-behind-the-pbm-led-gpo-curtain/.

[142] FED. TRADE COMM'N, Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies, Interim Staff Report, (July 2024) at 6.

[143] FED. TRADE COMM'N, Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies, Interim Staff Report, (July 2024) at 6.

[144] SENATE INSULIN REPORT at 39.

196. According to data that PBMs reported to the Texas Department of Insurance, fifteen PBMs collected a total of $4.39 billion in rebates, fees, and other payments from drug manufacturers in 2022 on health plans issued under Texas law. Of this, the PBMs kept $409 million—9.32%—for themselves.[145]

197. Indeed, PBMs advertise their rebate scheme as a way to save their clients—third-party payors—and prospective clients' money. PBMs pursue their clients by guaranteeing a large portion of the rebate payments to those payors and push their standard formularies, which are based on guaranteed rebate amounts. This leads PBMs to focus on maximizing rebates.[146]

198. PBMs then market these "flagship formularies" as having the most rebates to third-party payors and are the most used formularies by PBMs' clients. However, these rebates are not passed on to patients, and only lead to increase of drug's list prices, and ultimately, Payor's costs.

### i. Spread Pricing

199. PBMs generate additional revenue when patients fill their prescriptions through a practice known as "spread pricing."

200. Often, PBMs directly reimburse pharmacies on behalf of third-party payors for the third-party payor's share of the drug cost when a patient fills a prescription, rather than the third-party payor reimbursing the pharmacy directly. In turn, the third-party payor will reimburse the PBM. In this context, PBMs employ spread pricing to garner even more profit.

---

[145] FTC Complaint at ¶ 52.

[146] FTC Complaint at ¶ 106.

201.     Spread pricing is a practice where PBMs charge a third-party payor more for a prescription drug than what the PBM reimburses to the pharmacy for the same prescription. PBMs retain the difference, *i.e.*, the "spread."[147]

202.     Others in the pharmaceutical supply chain, such as drug wholesalers and pharmacies, also use spread pricing to earn profits.[148] The difference here is that PBMs are not purchasing or selling drugs. Rather, PBMs accept insurance payments and reimburse pharmacies, and are subject to no transparency to expose the degree to which they markup the spread for this purely administrative task. As a result, Payors can't determine how their money in purchasing a drug is allocated.[149]

203.     PBM's spread pricing increases third-party payors' overall cost of providing prescription drug benefits and patients' out-of-pocket expenses.

204.     Spread pricing also incentivizes PBMs to prioritize high-cost or specialty drugs— for which they can garner a larger spread and profit—and contributes to the overutilization of expensive medications when less-expensive biosimilar medications are available.[150]

205.     In a recent staff report, the FTC observed that the Big 3 generated a combined spread pricing income of approximately $1.4 billion from a sample of 51 specialty drugs from

---

[147] *Behind closed doors: Exposing the truth of PBM spread pricing*, Rightway (Feb. 29, 2024), https://www.rightwayhealthcare.com/blog/behind-closed-doors-exposing-the-truth-of-pbm-spread-pricing.

[148] T. Joseph Mattingly II et al., Pharmacy Benefit Manager Pricing and Spread Pricing for High-Utilization Generic Drugs, JAMA HEALTH FORUM, Oct. 2023.

[149] *Behind closed doors: Exposing the truth of PBM spread pricing*, Rightway (Feb. 29, 2024), https://www.rightwayhealthcare.com/blog/behind-closed-doors-exposing-the-truth-of-pbm-spread-pricing.

[150] *Id.*

2017 through part of 2022.[151] Further, the FTC reported that 82% of the spread retained by the Big 3 came from ten specialty generic drugs with the highest aggregate spread.[152]

       **ii.**       **PBMs use their market power to enter rebate agreements expressly conditioned on excluding generic drugs from coverage in favor of brand-name drugs.**

206.    The Big 3 structure rebate contracts such that higher rebates from drug manufacturers grant the manufacturers' brand-name drugs favorable placement on PBM formularies. Further, drug manufacturers can pay additional rebates to have their drugs listed as the only therapy on a given tier.[153] This is known as an exclusionary rebate agreement.[154]

207.    The FTC found that that these rebate structures may impede and impair competition and patient access to affordable medicines.[155]

208.    For example, the FTC pointed to one excerpt of a brand name drug manufacturer's rebate contract that shows higher brand manufacturer rebates premised on preferred positioning over other competing products and "additional" rebates to specifically exclude competing manufacturers of competitive products from the formulary. Further, it provided for "additional" rebates for implementing "brand step" requirements, meaning that patients must try and fail the preferred brand before being able to try the competing brand products.[156]

---

[151] FTC, INTERIM STAFF REPORT, SPECIALTY GENERIC DRUGS: A GROWING PROFIT CENTER FOR VERTICALLY INTEGRATED PHARMACY BENEFIT MANAGERS 23 (Jan. 2025) (hereinafter FTC SECOND INTERIM STAFF REPORT).

[152] *Id.* at 24.

[153] SENATE INSULIN REPORT at 40.

[154] FTC First Interim Staff Report at 66.

[155] *Id.*

[156] *Id.* at 67.

| REBATES FOR LANTUS® and LANTUS SoloSTAR® [1] (INCLUDES ALL NDCs, STRENGTHS & PACKAGE SIZES) | | 1 of 1 Manufacturer Status** | 1 of 2 Manufacturer Status** | 1 of 3 Manufacturer Status** | 1 of 4 Manufacturer Status | Listed Formulary Status |
|---|---|---|---|---|---|---|
| Non-Exclusion Formulary* | No Cost Share Differential | 63.0% | 58.0% | 56.0% | N/A | N/A |
| | Cost Share Differential | 63.0% | 58.0% | 56.0% | N/A | N/A |
| Exclusion Formulary* | | 63.0% | 58.0% | 56.0% | N/A | N/A |
| ACF / ACSF Closed Plans* | | 63.0% | 58.0% | 56.0% | N/A | N/A |

*CVS/caremark Clients with sixty percent (60%) or more of their Plan lives that qualify for a higher Formulary Type Rebate rate shall earn the higher rate on all Client utilization. Clients that do not meet this threshold shall be evaluated on a Plan by Plan basis. Additionally, for clarity, open Plans (i.e. Plans which do not otherwise qualify as Closed Plans), will receive Closed Plan Rebate rates for any Competitive Category which qualifies as Closed.

[1] Plan must have all NDCs, strengths, package sizes of Lantus, Lantus SoloSTAR and Toujeo on the Preferred Brand Tier without restrictions to be eligible for this Rebate.

**Within the Long-Acting Insulin Category as defined in Section O.

| INCREMENTAL ADDITIONAL BASE REBATE FOR ADOPTION OF EXCLUSIONS*: | |
|---|---|
| One Manufacturer of Competitive Products Excluded | 2.0% |
| Two Manufacturers of Competitive Products Excluded | 3.0% |
| Three Manufacturers of Competitive Products Excluded | N/A |

*The incremental rebates above may be used for any current or future PBM exclusions. For avoidance of doubt, incremental additional Base Rebate for adoption of Exclusions shall not apply to Non Preferred Brand Tier Status Rebates.

| NON-PREFERRED BRAND TIER STATUS FOR LANTUS® and LANTUS SoloSTAR® |
|---|
| N/A |

| Incremental Additional Base Rebate For Adoption of Brand Step Therapy Program: | |
|---|---|
| Implementation of Brand Step Therapy Program** | 2.0% |

209.    Some rebate contracts explicitly premise high rebates on the exclusion of AB-rated generics. These generic exclusions can be accomplished through "NDC blocks" of generic equivalents, that is, a contractual prohibition on payments for generic drugs, as identified by their National Drug Code or "NDC" number.[157]

210.    Other common levers employed in rebate contracts include additional rebates for "prior authorization" requirements, such that health plans must specifically authorize the patient to use a competing drug product.[158] And, contracts also include rules to indicate when a

---

[157] *Id.* at 68.

[158] *Id.* at 67-68.

pharmacy's substitution of a particular product is not permitted, known as "dispense as written" or "DAW."[159]

211.    Often, patient out-of-pocket costs are the lowest for generic drugs and highest for formulary-preferred, branded drugs. Thus, if generic drugs are excluded from a formulary by a PBM, the out-of-pocket cost to a patient is more than it could have been had the patient been allowed to access a generic version of the drug they need.[160] Patients and providers report that such costs have led patients to delay taking their medication, skip doses, or go without medication entirely, sometimes with fatal results.[161]

212.    Even cash-pay patients, including uninsured patients, are impacted by the rebate schemes and exclusionary formularies set in place by PBMs. When generic drugs enter a market, prices tend to fall dramatically. But if pharmacies do not offer drugs that will not generate profit, generics that are disfavored on formularies may not be stocked and not offered to patients.

213.    PBMs' preference for brand-name drugs also translates into higher costs for third-party payors, who end up covering patients' use of these more expensive drugs instead of lower-cost generic alternatives.

214.    In addition, the exclusionary rebates negatively impact the market as a whole; by limiting generic drug companies' ability to get more patient uptake, generic exclusions may deter and chill less expensive generic competitor drugs from entering the market at all. This frustrates state generic drug substitution laws and is in conflict with Congress' goal in enacting the Hatch-

---

[159] *Id.* at 68.

[160] *Id.* at 69.

[161] *Id.* at 69.

Waxman Act that created new pathways for generic drug product approval to make generic drugs more affordable.[162]

215.    If a patient needs a drug that is excluded from that patient's insurer's formulary, the patient is forced to either switch to a new product or pay significantly more to stay on the formulary's preferred medication. Both of these options may lead to lack of adherence, ineffective health outcomes, and/or inability to afford the medication.

216.    The FTC Complaint lists several non-insulin drugs whose low WAC versions were excluded from PBM formularies in favor of the high WAC versions, including Hepatitis C medications Harvoni and Epclusa, or rheumatoid arthritis medications Amjevita and Cyltezo.[163]

217.    The U.S. Health Services Department investigated the use of generic and brand-name versions of Epclusa or Harvoni to conclude that "Medicare beneficiaries are much less likely to receive lower-cost versions of the same drugs (i.e., authorized generics)—as well as other widely-used lower-cost brand-name drugs—to treat hepatitis C." It observed that "Part D's programmatic structure may lead plan sponsors preferring higher-cost versions, resulting in beneficiaries paying thousands more out-of-pocket and nearly double Medicare insurance."[164] According to the OIG's analysis, the cost of the more expensive hepatitis C drugs used in 2020 exceeded $65,000 per beneficiary while the generic versions cost about $25,000.[165]

---

[162] *Id.* at 70.

[163] FTC Complaint at ¶¶ 40-41.

[164] Office of Inspector General, U.S. Department of Health and Human Services, Part D Plan Preference for Higher-Cost Hepatitis Drugs Led to Higher Medicare and Beneficiary Spending 1 (Aug. 2022), https://oig.hhs.gov/documents/evaluation/3214/OEI-BL-21-00200-Complete%20Report.pdf

[165] *Id.* at 13.

218.    FTC Complaint expects that this trend is to be replicated in case of Amgen's Amjevita and Boehringer Ingelheim's Cyltezo.[166] Both companies simultaneously launched both high and low WAC versions.[167] Low WAC alternative of Cyltezo has already been excluded on one formulary.[168]

219.    Such rebate schemes and exclusionary formularies impede and impair patient access to less affordable medications and increase the costs of prescription drugs for Payors.

### iii.    The Big 3's rebate scheme especially impacts biosimilar competition.

220.    Rebates are most commonly associated with high-cost, branded drugs in highly competitive markets, such as biologics (i.e., large molecule drugs).[169]

221.    Rebate walls around biologics are particularly harmful to patients and employers because of their high costs—biologics are among the most expensive therapies, with annual costs

---

[166] FTC Complaint at ¶ 250. *See also* Adam Fein, *The Warped Incentives Behind Amgen's Humira Biosimilar Pricing-And What We Can Learn from Semglee and Repatha*, Drug Channels (Feb. 7, 2023), https://www.drugchannels.net/2023/02/the-warped-incentives-behind-amgens.html.

[167] FTC Complaint at ¶ 250.

[168] *Id.*

[169] NITZAN ARAD ET AL., DUKE-ROBERT J. MARGOLIS MD. CENTER FOR HEALTH POLICY, REALIZING THE BENEFITS OF BIOSIMILARS: BIOSIMILARS AND REBATE WALLS (2022), https://healthpolicy.duke.edu/sites/default/files/2022-03/Biosimilars%20-%20Overcoming%20Rebate%20Walls.pdf; *Biologics (Biologic Medicine)*, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/biologics-biologic-medicine (last visited Feb. 19, 2025) ("Biologics are medications that come from organic life. Scientists produce biologic medications by removing organic proteins or genetic materials from cellular lifeforms and, when possible, reproducing them.").

typically ranging from $10,000 to $30,000.[170] These high prices are driven by the complexities of biologic development and manufacturing.[171]

222.     Biosimilars, like small-molecule generics, are lower-cost alternatives to brand-name biologics (referred to as "reference products") with no clinically meaningful differences. Because of streamlined regulatory pathways that eliminate the need to duplicate costly clinical trials, biosimilars are typically 15% to 35% cheaper than their reference products.[172]

223.     In the context of biologics, rebate walls often favor more expensive reference products over lower-cost, therapeutically equivalent biosimilar alternatives. For example, biosimilars are preferred by major health plans over 14% of the time.[173]

224.     Rebate walls around biologics are particularly problematic due to the exceptionally high prices of these therapies and their growing share of U.S. pharmaceutical spending.[174] These practices not only increase costs for patients and employers, but also deter investment in future biosimilar development, stifling competition and perpetuating high drug prices.[175]

---

[170] Brian K. Chen et al., *Why Biologics and Biosimilars Remain So Expensive: Despite Two Wins for Biosimilars, the Supreme Court's Recent Rulings do not Solve Fundamental Barriers to Competition*, 78 DRUGS 1777 (Nov. 2018).

[171] Favour Danladi Makurvet, *Perspective: Biologics vs. small molecules: Drug costs and patient access*, MEDICINE IN DRUG DISCOVERY, 2021, https://www.sciencedirect.com/science/article/pii/S2590098620300622.

[172] *Biosimilars Info Sheet: Generics and Biosimilars*, FDA, https://www.fda.gov/media/154912/download (last visited Feb. 19, 2025); Kimberly Feng et al., *Patient Out-of-Pocket Costs for Biologic Drugs After Biosimilar Competition*, JAMA Health Forum, Mar. 2024, https://jamanetwork.com/journals/jama-health-forum/fullarticle/2816952.

[173] Nitzan Arad et al., Duke-Robert J. Margolis MD. Center for Health Policy, Realizing the Benefits of Biosimilars: Biosimilars and Rebate Walls 14 (2022), https://healthpolicy.duke.edu/sites/default/files/2022-03/Biosimilars%20-%20Overcoming%20Rebate%20Walls.pdf.

[174] *Id.* (while biologics only constitute 2% of all prescriptions nationally, they account for 43% of total drug spending and more than 90% of the growth in net drug spending between 2014 and 2019).

[175] *Id.* at 16.

69

iv.     **The Big 3 demand excessive fees to administer their rebate scheme.**

225.    PBMs, through rebate aggregators, charge administrative fees to drug manufacturers as part of their rebate negotiations. PBMs represent these fees are for maintaining and overseeing the rebate programs, negotiating and contracting with clients to participate in the rebate program, monitoring compliance with rebate eligibility requirements, and calculating and invoicing rebates applicable to drug utilization.[176]

226.    Administrative fees are tied to the cost of prescription drugs. Because administrative fees are generally calculated as a percentage of a drug's WAC, PBMs and their rebate aggregators collect higher fees on drugs with higher WACs—even though the PBMs and rebate aggregators perform the same services for the various drugs, regardless of their WAC.[177]

227.    In addition to administrative fees, PBMs use "inflationary protection" or "price protection" provisions that require manufacturers to pay PBMs additional rebates if drug manufacturers raise their WACs above a certain percentage.[178]

228.    PBMs also require drug manufacturers to pay "data fees" that grant manufacturers access to a portal that contains drug utilization and other data for the manufacturer's drugs. Because data fees are calculated as a percentage of WAC, the PBMs and rebate aggregators collect higher fees on a drug with a higher WAC than on a drug with a lower WAC, even though the PBMs and rebate aggregators provide the same data services.[179]

229.    The problem is exacerbated by a lack of transparency surrounding the administrative fees. For example, Part D plans are not required to report the administrative fees

---

[176] FTC Complaint at ¶ 45.

[177] *Id.* at 46.

[178] SENATE INSULIN REPORT at 40.

[179] FTC Complaint at ¶¶ 47-48.

they collect "if the fees are for bona fide services and are at fair market value," leading to a lack of transparency in the Medicare program.[180]

230.    A recent study estimated that between 2012 and 2016, the amount of administrative fees nearly tripled, reaching a total of more than $16 billion.[181] Today, PBMs demand double the amount of fees from drug manufacturers, pharmacies and third-party payors today than they did five years ago.[182]

231.    Finally, PBMs also charge third-party payors non-rebate, administrative fees for providing pharmacy benefit management service. In this way, PBMs are profiting from all sides of the transaction.[183]

**D.    The Big 3 rebate scheme constitutes commercial bribery.**

232.    The rebates and fees demanded by Defendants are payments other than for services rendered, constituting commercial bribes and kickbacks. By soliciting and receiving these payments, Defendants have breached the fiduciary duty owed to their health benefit plan clients and their insureds. Therefore, in purpose and effect, the rebate scheme constitutes commercial bribery through unlawful kickbacks.

233.    The kickbacks were and continue to be paid from the difference between drug manufacturers' published WAC prices and the net selling prices agreed upon by the drug manufacturers and Defendants. Drug manufacturers were forced to artificially raise drug prices paid by patients in order to afford the exorbitant kickbacks labeled as "rebates" and "fees."

---

[180] FTC Complaint at ¶ 81.

[181] FTC Complaint at ¶ 82.

[182] Susan Morse, *PBMs are driving up drug prices through fees, PhRMA report claims*, Healthcare Finance News (Sept. 18, 2023), https://www.healthcarefinancenews.com/news/pbms-are-driving-drug-prices-through-fees-phrma-report-claims.

[183] FTC Complaint at ¶ 82.

234.    The resulting increased spread—ultimately paid for by Plaintiff and Class members—was the source of the money funding the kickbacks that drug manufacturers paid to Defendants.

235.    In a well-functioning, competitive market, PBMs would exercise the leverage they possess by virtue of their role in creating and managing formularies to negotiate lower prices from drug manufacturers. In other words, a competitive price would provide a legitimate basis to confer formulary status to the least costly medication.

236.    However, since 2012, Defendants have demanded bribes and kickbacks to eliminate the price-disciplining effects from competition. Because so much of the rebates and fees flow into Defendants' coffers (rather than being paid to their clients), Defendants benefit from higher WAC prices because it results in higher rebate and fee payments that they keep for themselves (even though doing so is contrary to the interests of the PBMs' health benefit provider clients).

**E.    Defendants steer patients to Big 3-affiliated pharmacies to minimize competition.**

237.    In its July 2024 report, the FTC outlined a multitude of ways that Defendants steer customers away from independent, unaffiliated pharmacies and towards Big 3-affiliated pharmacies.[184] According the report:

> PBMs routinely create narrow and preferred pharmacy networks that can advantage their own pharmacies while excluding rivals, and PBMs regularly adjust formularies, including by designating drugs as specialty medications, which triggers exclusivity provisions in contracts with certain payers that require use of the PBM's affiliated specialty pharmacy.[185]

---

[184] FTC FIRST INTERIM STAFF REPORT, at 30–38.

[185] *Id.* at 31–32.

238.     PBMs are especially motivated to steer patients with prescriptions for expensive specialty drugs to affiliated specialty pharmacies.[186] As internal PBM board presentation reviewed by the FTC stated, "'[s]teering to…captive specialty pharmacies' is a 'major' driver of value for PBMs."[187] This was further supported by the FTC's January 2025 report, which found that "dispensing patterns suggest that the Big 3 PBMs may be steering highly profitable prescriptions to their own affiliated pharmacies (and away from unaffiliated pharmacies)"[188] and recommended that these steering practices be subject to further scrutiny.[189]

239.     PBM contracts may bundle certain services and assets—such as limited distribution drugs—in order to promote the use of affiliated pharmacies.[190] PBM contracts may also expedite the resolution of PBM-imposed drug utilization management requirements if physicians send prescriptions to affiliated pharmacies.[191]

240.     Further, PBMs use information obtained through affiliated, vertically integrated insurers to undertake targeted "marketing campaigns" which employ inaccurate and/or deceptive information to coerce or trick patients to switch to affiliated pharmacies.[192]

---

[186] *Id.* at 33–34.

[187] *Id.* at 34 (quoting Redacted Respondent Document Submission) (bracketed material and ellipses in original).

[188] FTC SECOND INTERIM STAFF REPORT, at 2.

[189] *Id.* at 30.

[190] FTC FIRST INTERIM STAFF REPORT, at 32–33.

[191] *Id.* at 33.

[192] *Id.*

241.    As part of its investigation of PBMs, the FTC received over a thousand public comments, hundreds of which complained of and provided support for the Big 3's steering practices.[193]

242.    Regarding contractual requirements to fill specialty prescriptions with Big 3-affiliated specialty pharmacies, regardless of patient preference, a provided commented that their patients "are steered to PBM-owned pharmacies due to network limitations which are established by PBMs whether this is beneficial to the patient or not."[194] Similarly, one patient commented:

> I am forced by my health insurance company, Regence Blue Shield, and their pharmacy benefits manager, Prime Therapeutics, to order my specialty medications through Accredo Specialty Pharmacy. I have explained to my insurance company that the requirement to use Accredo results in delays receiving my medication, but they refuse to authorize me to use an alternative pharmacy.[195]

243.    Regarding the inaccurate and/or deceptive "marketing campaigns," an independent pharmacist commented that their "constant battle" to retain customers was "never ending" where "[m]any receive letters telling them we are no longer in their prescription program, BUT WE ARE. They use this tactic to direct my patients to PBM owned pharmacies or their preferred pharmacies."[196]

---

[193] FTC, Solicitation for Public Comments on the Business Practices of Pharmacy Benefit Managers and Their Impact on Independent Pharmacies and Consumers (Feb. 17, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/Solicitation%20for%20Public%20Comments%20on%20the%20Business%20Practices%20of%20Pharmacy%20Benefit%20Managers.pdf. *See also* FTC, *Solicitation for Public Comments on the Impact of Prescription Benefit Managers' Business Practices*, REGULATIONS, https://www.regulations.gov/docket/FTC-2022-0015 (last visited Feb. 21, 2025).

[194] Comment of T. Leigh Hester, FTC-2022-0015-0349 at 1 (Apr. 11, 2022), https://www.regulations.gov/comment/FTC-2022-0015-0349.

[195] Comment of Rachel Marren, FTC-2022-0015-0075 (Mar. 3, 2022), https://www.regulations.gov/comment/FTC-2022-0015-0075.

[196] Comment of Thomas J. Hunt, FTC-2022-0015-0326, at 2 (Apr. 8, 2022), https://www.regulations.gov/comment/FTC-2022-0015-0326.

244. Additionally, a comment submitted by American Pharmacy Cooperative, Inc., a member-owned GPO established to "protect and promote the interests of independent pharmacy,"[197] revealed that "there are time when PBMs will steer not only to their PBM owned pharmacies but also the affiliate pharmacy of another PBM" and provided excerpted language from a contract between two PBMs uncovered via a Georgia Open Records Act request:

> PBM [#1] acknowledges and agrees that [PBM # 2] may steer Members to any pharmacy or pharmacies of [PBM #2's] chouse *(sic)* through any means (e.g. preferred pharmacies over non-preferred pharmacies; specialty pharmacies for Specialty Drug fills over retail pharmacies; etc.).[198]

245. When considered along with the relative stability of market share for specialty drug pharmacy dispensing between the Big 3, which suggests very little competition between Defendants in this market,[199] Defendants' steering practices are indicative of a horizontal market allocation agreement.[200]

## F. Defendants' practices have led to dramatic price increases of life-saving drugs.

### i. EpiPen

246. Manufacturers and PBMs enter negotiations where the PBMs try to secure the highest possible rebates.

---

[197] APCI, https://www.apcinet.com/ (last visited Feb. 21, 2025).

[198] Comment of Am. Pharm. Coop., Inc., FTC-2022-0015-0676, at 6 (May 25, 2022), https://www.regulations.gov/comment/FTC-2022-0015-0676 (bracketed material in original, italicize added).

[199] *See* FTC FIRST INTERIM STAFF REPORT, at 20.

[200] Horizontal market allocation agreements can "cover something less than, or different from, absolute bans on selling in one another's designated territory or to one another's designated customers." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 2030c (Sept. 2024 update)*. See also United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1273 (10th Cir. 2018) (market allocation can be accomplished by allocating customers).

247. For example, in late 2012, OptumRx warned Mylan that "EpiPen is at risk" if it didn't offer rebates because the PBM was "well aware of the price increases Mylan [had] taken." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 545 F. Supp. 3d 922, 971 (D. Kan. 2021) (bracketed material in original). OptumRx also gave Mylan an example where "the benefit exclusion can be flipped to exclude the prominent brand." *Id.* About a month later, OptumRx told Mylan that it expected Sanofi to make a "strong rebate offer to gain coverage and potentially displace EpiPen[,]" so it was seeking a "competitive bid" from Mylan "to maintain [its] current positioning." *Id.*

248. As part of its negotiations with Express Scripts to achieve coverage for Auvi-Q, Sanofi offered additional rebates on its insulin drug Lantus. *Id.* at 974. As a Sanofi witness testified, the Lantus offers were an "unprecedented" and "desperate move" by Sanofi to secure more formulary access for Auvi-Q. *Id.*

249. Express Scripts responded by telling Mylan that it would switch to covering Auvi-Q as a preferred product in 2015. *Id.* Express Scripts then gave Mylan an ultimatum: Either offer a 45% rebate to share Tier 2 with Auvi-Q or offer a 58% rebate to remain exclusive. *Id.* Mylan responded by offering a 45% rebate to share Tier 2 with Auvi-Q but offered just a 55% rebate to remain exclusive. *Id.* Express Scripts accepted Mylan's 45% rebate offer and covered both EpiPen and Auvi-Q on its main formulary in 2015. *Id.* But, it excluded EpiPen on its High Performance formulary in favor of Auvi-Q. Doc. 2161-12 at 3 (Defs.' Ex. 285). *Id.*

250. Sanofi had success with Aetna too. It offered Aetna a 65% rebate for exclusivity for 2015. *Id.* Aetna then used Sanofi's offer to push Mylan to offer a 45% rebate for EpiPen to be co-preferred on Tier 2. *Id.* Ultimately, Sanofi agreed to a 30% rebate for Auvi-Q to be co-preferred on Tier 2 (a lower rebate than Mylan for the same access). *Id.* Aetna then made EpiPen and Auvi-Q co-preferred on its value and premier formularies effective January 1, 2015. *Id.*

251. OptumRx/UnitedHealth Group expressly requested an offer for exclusive coverage, and it told Sanofi its target rebate was 60%. *Id.* at 975. Sanofi did not make an exclusive offer, offering instead a lower rebate (35%) for coverage at any tier. *Id.* In contrast, Mylan offered a higher rebate (37%) for exclusive coverage and maintained its exclusive position. Doc. 2163-1 at 10 (Defs.' Ex. 304). *Id.*

252. CVS Caremark serves as an example of a PBM who successfully shifted patients to Auvi-Q after it excluded EpiPen from its Advanced Control Formulary ("ACF"). *Id.* at 976. On this plan, EpiPen's market share went from 92% in Q4 2014 to 0.2% by Q2 2015. *Id.* CVS told Mylan in 2015 that its market share on that formulary was "all but gone." *Id.* at 3. CVS also noted that EpiPen's market share on CVS's Value Based Formulary was "still holding share." *Id.* at 976-77.

### ii.     Humira

253. Humira, AbbVie's blockbuster rheumatoid arthritis drug, is a good example of list price inflation caused by Defendants' exclusionary formularies. Humira's list price increased 78% from 2015 to 2019. Yet, most of the list price increase is attributable to manufacturer payments—which grew over 600% during this period. In sharp contrast, the net price AbbVie received for Humira only grew about 18% (from $2,623 to $3,104 in 2019).

254. The New York Times PBM Investigation also focused on Humira in discussing how Defendants' profit from the manufacturer payments paid by AbbVie, even at the great expense of patients and payors:

> Perhaps the clearest example of how the P.B.M.s find creative ways to profit is Humira, the blockbuster medication for conditions like arthritis.
>
> After two decades of the brand-name drug being the only version available, lower-cost alternatives came on the market in 2023. Collectively, employers, insurance programs and patients stood to save up to $6 billion a year by switching to copycat drugs, according to the data company IQVIA.

But P.B.M.s would lose money from switching. Humira had become a big moneymaker for P.B.M.s, in large part because its manufacturer, AbbVie, was shelling out hundreds of millions of dollars in fees to the benefit managers' [rebate aggregators]. Those fees would vanish if the P.B.M.s switched patients off Humira.

The P.B.M.s moved slowly. In March, 14 months after the first cheaper version became available, 96 percent of prescriptions for the drug in the United States were still for the brand-name version, according to IQVIA.[201]

255.    In exchange for drug manufacturers raising their list prices and paying the PBMs increasing amounts in manufacturer payments, PBMs grant the drug manufacturers' products with the highest list price and highest manufacturer payment amount preferred status on their formularies, while at the same time excluding lower priced drugs.

256.    The share of PBM profits from fees charged to manufacturers, pharmacies, health insurers and employers has increased by more than 300% over the last decade.[202]

257.    This increase is, in part, due to PBMs expanding traditional administrative fees, as well as creating and including new fees that did not exist five years ago.[203]

258.    Just as with rebates, PBMs increasingly funnel these new fees through their opaque contracting entities, group purchasing organizations.[204]

259.    Together, rebates and fees received by PBMs account for 42% of every dollar spent on brand name drugs in the commercial market.[205]

---

[201] Rebecca Robbins & Reed Abelson, *The Middlemen: The Opaque Industry Secretly Inflating Prices for Prescription Drugs*, NY TIMES (June 21, 2024), https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html.

[202] Susan Morse, *PBMs are driving up drug prices through fees, PhRMA report claims*, Healthcare Finance News (Sept. 18, 2023), https://www.healthcarefinancenews.com/news/pbms-are-driving-drug-prices-through-fees-phrma-report-claims.

[203] *Id.*

[204] *Id.*

[205] *Id.*

**G.    Drug prices spiked following Big 3 meetings.**

260.    Each year during the relevant time period, the main PBM trade association, the Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.

261.    Every year, high-level representatives and corporate officers from both PBMs and manufacturers attend these conferences to meet in person to discuss their shared business opportunities within the pharmaceutical industry.

262.    From at least 2010 to 2019, representatives from manufacturers met privately with representatives from each PBM Defendant during both the Annual Meetings and Business Forum conferences that the PCMA held each year.

263.    Prior to these meetings dedicated teams of executives from each Defendant would spend weeks preparing PCMA "pre-reads" and reports in preparation for these meetings.

264.    Notably, key at-issue lockstep price increases occurred shortly after Defendants met at PCMA meetings. For example, on September 26 and 27, 2017 the PCMA held its annual meeting where each of the drug manufacturers hosted private rooms and executives from each Defendant engaged in several meetings throughout the conference. Several days after the conference, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list by 5.4%. A few weeks later Novo Nordisk recommended that the company make a 4% list price increase on January 1, 2018, to match the Sanofi increase, which was approved Nov 3, 2017.

265.    Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir several hours after Sanofi took its list price increase on Lantus and this occurred only a few weeks after a PCMA spring conference in Washington DC attended by representatives from all Defendants.

## V.     Plaintiffs Purchased Drugs Directly from Defendants

266.    Patient Plaintiffs are in a direct purchaser relationship with CVS Caremark, OptumRx and Express Scripts because there is a single sale from the retail, mail order, or specialty pharmacy within the corporate family directly to patients. As explained *supra*, the entities within the CVS Health corporate family, the Evernorth corporate family, and the UnitedHealth Group corporate family named as Defendants in this case do not operate as separate entities but rather as a single business enterprise. All the entities, including the affiliated PBMs and pharmacies, are owned by the same parent companies and function as divisions or departments of a single company. Drug prices are set internally along the fully integrated distribution chain. The parent company is unlikely to permit its subsidiary or division to bring a lawsuit against its other subsidiary or division, as such an action would only reveal the group's participation in the conspiracy.

267.    For example, the relationships between the entities within the CVS Health corporate family are so intertwined that CVS Pharmacy, Inc. invoked a mandatory arbitration provision from contracts entered into by Caremark, L.L.C. and CaremarkPCS, L.L.C. *See* Def.'s Mot. to Stay Proceedings Pending Arbitration at ¶ 2, *Gable Family Pharmacy et al v. CVS Pharmacy, Inc.*, No. 1:11-cv-01810 (N.D. Ill. Apr. 24, 2012), ECF No. 72.

268.    Whenever a patient purchases drugs through a mail order pharmacy, the receipt is issued by the respective PBM, not the pharmacy. For example, receipts from CVS's mail order pharmacy are issued by CVS Caremark, not CVS Pharmacy.

269.    Similarly, third-party payor Plaintiffs are also in a direct-purchaser relationship with CVS Caremark, OptumRx, and Express Scripts.

270.    Since third-party payor Plaintiffs maintain a self-funded plan, they do not rely on a third-party insurer to pay for its insured's medical care, pharmaceutical benefits, or prescription

drugs. Rather, third-party payor Plaintiffs directly contract with, and directly pay, PBMs (and their affiliated pharmacies) for pharmaceutical benefits and prescription drugs.

271. Some third-party payor Plaintiffs nominally contract with health insurance providers who in turn contract with PBMs. The named third-party payor Plaintiff, for example, contracted with Blue Cross Blue Shield of Louisiana, which, in turn, contracted with PBM to provide the pharmacy benefit management services. However, even in these cases, such third-party payor Plaintiffs maintain a direct relationship with PBMs, as the health insurance providers in these circumstances act as PBMs' agents.

272. As explained above, PBMs exercise a great deal of control over even the largest health insurers, which, through their health plans and plan sponsor services, provide coverage for hundreds of millions of Americans. The Big 3 PBMs are vertically integrated with the largest health insurers in the country that offer fully-insured, administrative services only, and Medicare Part D plans.

273. Indeed, some health insurers do not permit their clients to shop for PBM services. Rather, the client must use the PBM affiliated with the health insurer. PBMs knowingly permit the vertically integrated health insurers to require this exclusive relationship. This close relationship creates a reasonable appearance of health insurers' authority to act on behalf of PBMs.

274. Third-party payor Plaintiffs then rely on this reasonable appearance when entering into contractual relationships with health insurers.

## ANTITRUST INJURY

275. Defendants' conspiracy directly damaged patients and third-party payors who pay or reimburse for all or portion of the purchase price of the prescription drugs that have been processed through a PBM. By reason of the alleged violations of the antitrust laws, including price fixing, market and customer allocation, and commercial bribery, Plaintiffs and the Class have

sustained injury to their businesses or property by having paid higher prices for prescription drugs than they would have paid in the absence of Defendants' illegal conduct, and as a result have suffered damages.

276.    But for Defendants' conspiracy to artificially raise, fix, maintain, and/or stabilize prescription drug prices and to engage in market and customer allocation, and Defendants' practices of soliciting and receiving commercial bribes in the form of rebates and administrative fees, Plaintiffs and the Class would have paid a competitive price for the prescription drugs.

277.    While the conspiracy and commercial bribery schemes continue, Plaintiffs will continue to suffer losses.

278.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## MARKET POWER

279.    The relevant product market is market for patients covered by a health plan (whether through a major insurer, a government funded health insurance program, or an employee sponsored plan) whose pharmaceutical drug purchases are managed by a PBM.

280.    Within this market, PBMs compete to manage pharmaceutical programs for third-party payors. PBMs serve as middlemen, negotiating terms and conditions, including pricing and rebates, with drug companies.

281.    The relevant geographic market is the United States and its territories.

282.    The Big 3—CVS Caremark, Express Scripts, and OptumRx—manage 79% of all prescription drug claims in the United States.

283.    Three PBMs—CVS Caremark, Express Scripts, and OptumRx—have monopoly position (market share equal to 50% or more) in several states:

| PBM | # of States Where PBM Has Monopoly (>=50%Market Share) '21 | Nationwide Market Share of PBM '21 | # of States Where Largest PBM '21 | # States Where 1st or 2nd Largest PBM '21 |
|---|---|---|---|---|
| Express Scripts | 7 | 26% | 12 | 20 |
| Prime Therapeutics | 6 | ~5-6% | 16 | 19 |
| CVS Caremark | 4 | 33% | 6 | 15 |
| OptumRx | 2 | 21% | 4 | 22 |
| Humana Pharmacy Solutions | 0 | 8% | 0 | 1 |
| MedImpact | 0 | 4% | 1 | 1 |

284.     There are significant barriers to entry for new entrants hoping to operate and compete in the PBM market. Among other things, PBMs must comply with specific licensing requirements.[206] The PBMs must also continuously monitor and comply with legal and regulatory requirements, invest large amounts of capital to support the infrastructure required to undertake contract negotiations with large drug manufacturers, pharmacy retail plans, and third-party payors. Additionally, competing in this market requires specialized expertise about how the pharmaceutical and healthcare supply chains work, sophisticated systems for tracking, reimbursing, and adjudicating pharmaceutical prescriptions, and specialized knowledge about how to design drug formularies in order to optimize allocation of pharmaceutical spend among the PBMs.

285.     Defendants, through their conspiratorial contacts, collectively hold dominant power in the relevant market.

286.     Defendants' high market concentration is circumstantial evidence conspiracy. This power has allowed Defendants' conspiracy to flourish and impose anticompetitive effects on the entire relevant market.

---

[206] *State Pharmacy Benefit Manager Legislation*, NASHP (updated Oct. 21, 2024), https://nashp.org/state-tracker/state-pharmacy-benefit-manager-legislation/.

## CLASS ACTION ALLEGATIONS

287.    Plaintiffs bring this action on behalf of themselves and under Federal Rule of Civil

Procedure 23(a), (b)(1), (b)(2), and (b)(3) as representatives of a class of direct purchaser Payors

defined as follows:

> All persons or entities: (1) that, for consumption by their members, insureds, or
> beneficiaries, paid and/or provided reimbursement for some or all of the purchase
> price for a prescription drug other than or in addition to insulin dispensed at an
> affiliated pharmacy (CVS Pharmacy, CVS Caremark Mail Service Pharmacy, CVS
> Specialty Pharmacy, Express Scripts Pharmacy, Accredo, Optum Rx Mail Service
> Pharmacy, Optum Specialty Pharmacy) between January 1, 2012, and until
> Defendants' unlawful conduct and its anticompetitive effects cease to persist; or (2)
> who paid for some or all of the purchase price for a prescription drug other than
> insulin dispensed at an affiliated pharmacy (CVS Pharmacy, CVS Caremark Mail
> Service Pharmacy, CVS Specialty Pharmacy, Express Scripts Pharmacy, Accredo,
> Optum Rx Mail Service Pharmacy, Optum Specialty Pharmacy) between January
> 1, 2012, and until Defendants' unlawful conduct and its anticompetitive effects
> cease to persist.

288.    Specifically excluded from this Class are Defendants; the officers, directors, or

employees of any Defendant; any entity in which any Defendant has a controlling interest; and any

affiliate, legal representative, heir, or assign of any Defendant. Also excluded from the Class are

any federal, state, or local governmental entities, any judicial officer presiding over this action and

the members of his/her immediate family and judicial staff, any juror assigned to this action, and

any co-conspirator identified in this action.

289.    By way of clarity and to the extent not excluded above, the Class includes, but is

not limited to, patients, self-insured non-governmental entities, third-party payors that offer

insured plans to private individuals and groups, union health and welfare plans, entities that

contract to provide programs for the Federal Employees Health Benefit program, sponsors of plans

under Medicare Part D, and Managed Medicaid plan sponsors.

290.    The Class is so numerous as to make joinder impracticable. Plaintiffs do not know

the exact number of Class members, but the above-defined class is readily identifiable and is ones

for which records should exist. Plaintiffs believe that due to the nature of the product market there are at least millions of members of the Class in the United States.

291.    Common questions of law and fact exist as to all members of the Class. Plaintiffs and the Class were injured by the same unlawful commercial bribery and conspiracy to restrain trade in the prescription drug industry, and Defendants' anticompetitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

(a)    whether Defendants and their co-conspirators engaged in a combination or conspiracy to restrain trade in the prescription drug industry in the United States;

(b)    the duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(c)    whether such combination or conspiracy is *per se* unlawful under Section 1 of the Sherman Act;

(d)    whether such combination or conspiracy violated the antitrust and consumer protection laws of various states;

(e)    whether Defendants and their co-conspirators engaged in a kickback scheme and thereby committed commercial bribery;

(f)    whether such conduct is a violation of Section 2(c) of the Robinson-Patman Act;

(g)    whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiffs and other members of the Class;

(h)    whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on non-insulin prescription drugs;

(i)     the effect of Defendants' alleged conspiracy on the prices of non-insulin prescription drugs sold in the United States during the Class Period;

(j)     the effect of Defendants' alleged commercial bribery on the prices of non-insulin prescription drugs in the United States during the Class Period;

(k)     the appropriate Class-wide measure of damages; and

(l)     the nature of appropriate injunctive relief to restore competition in the United States market for non-insulin prescription drugs.

292.    Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for prescription drug sold in the United States.

293.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

294.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

295.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

296.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including

providing injured persons or entities with a method for obtaining redress for claims that it might

not be practicable to pursue individually, substantially outweigh any difficulties that may arise in

management of this class action. Moreover, the prosecution of separate actions by individual

members of the Class would create a risk of inconsistent or varying adjudications, establishing

incompatible standards of conduct for Defendants.

297.     Plaintiffs know of no difficulty likely to be encountered in the maintenance of this

action as a class action under Federal Rule of Civil Procedure 23.

## CAUSES OF ACTION

### Count I: Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) on Behalf of the Class

298.     Plaintiffs incorporate by reference the allegations contained in preceding

paragraphs of this Complaint as though fully set forth herein.

299.     Beginning in at least 2012, and continuing thereafter to the present, Defendants, by

and through their offices, directors, employees, agents, or other representatives, have explicitly or

implicitly colluded and conspired to jointly implement and maintain drug manufacturer rebate and

administrative fee schemes in order to artificially rase, fix, maintain, and/or stabilize prescription

drug prices in the United States prescription drug market, and have engaged in market and

customer allocation through the use of patient steering practices in order to minimize competition

between Defendants in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

300.     Defendants' actions were not mere independent parallel conduct but took place in

the context of multiple facts evidencing a conspiracy.

301.     First, the market for pharmaceutical drugs is highly concentrated: The Big 3

manage 79% of all United States claims, representing a sharp increase from the 52% of the market

that the Big 3 held just twenty years ago. The Big 3 underwent mergers and acquisitions in the

2010s that contributed to increasing market dominance, including Express Scripts' acquisition of

Medco Health Solutions in 2012 (combining the first and third largest PBMs by shares of claims managed), OptumRx's acquisition of Catamaran in 2015 (combing the third and fourth largest PBMs with 13% and 9% shares of claims managed), and CVS Health's merger with Aetna in 2018 (increasing CVS Caremark's market share by five percentage points to 30%).

302. Second, the market for pharmaceutical drugs is vertically integrated: PBMs are vertically integrated with health insurers, health care providers, pharmacies and drug private labelers. The Big 3 are vertically integrated with the largest health insurers in the country that offer fully-insured, administrative services only, and Medicare Part D plans; some health insurers do not permit clients to comparison shop for PBM services, but must use the PBM affiliated with the health insurer. Specifically, CVS Caremark is vertically integrated with health insurer Aetna, Express Scripts is vertically integrated with health insurer Cigna, and OptumRx is vertically integrated with UnitedHealth Gorup. Additionally, common ownership of publicly traded shares of UnitedHealth Group, CVS Health and Humana further reduce competition by softening incentives to compete.

303. Third, Defendants have a strong motive to conspire to preserve the presently opaque market structure. The Big 3 extract exorbitant rebates and fees from drug manufacturers, creating an artificial inflation of drug list prices. Defendants have established a formulary management system where favorable placement of specific drugs on formularies is conditioned upon drug manufacturers payment of excessive rebates to the PBMs. And, because this formulary access is critical to drug manufacturers' ability to sell their products, drug manufacturers are forced to raise their list prices to meet these rebate demands. Drug manufacturers who offer even larger rebates may receive exclusive placement on PBMs' formularies, meaning bio-similar or generic versions of a specific type of drug are excluded from the formulary, thereby increasing drug list prices further while denying patients coverage for drugs they are prescribed. Additionally, PBMs use

their industry power to extract administrative and other fees from drug manufacturers, many of which are allocated to administration of the rebate scheme. Defendants were and are, therefore, motivated to conspire amongst themselves to implement and maintain complex and artificially inflated drug rebate and administrative fee schemes to protect their profits without having to compete on the merits of price and services.

304.     Fourth, Defendants formed and maintained their conspiracy using a high degree of inter-firm communication through the Pharmaceutical Care Management Agreement (PCMA), the national trade association for PBMs. The Big 3 PBMs have dominated top-level executive positions since at least 2012. The PCMA annual meeting and Business Forum provide forums to facilitate collusion between PBMs including through private meetings, dinners, receptions, and digital platforms.

305.     Fifth, Defendants' actions were against their apparent economic self-interest in the absence of collusion. Generally, lower prices are reflective of a competitive market because companies offer better deals to attract consumers and gain market share. This is different than the pattern of continually higher prices seen here.

306.     Defendant PBMs are each direct business competitors that conspired to implement and maintain drug manufacturer rebate and administrative fee schemes within the prescription drug manufacturing and distribution market.

307.     The conspiracy's intended and actual effect is to inflate drug manufacturer rebate rates and fees above competitive levels.

308.     This conspiracy misallocates resources by artificially inflating rebates retained by and fees charged by Defendants, thereby inflating the cost of prescription drugs to patients and third-party payors.

309. Defendants' conspiracy does not integrate any economic functions that could plausibly create any economic efficiencies or economies of scale and does not produce any pro-competitive effects. Even if the conspiracy had produced any such effects, those effects could easily be achieved by significantly less restrictive means than the horizontal aggregation of market power and the suppression of horizontal price competition, and any pro-competitive effects are substantially outweighed by the conspiracy's anticompetitive effects.

310. In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including requiring exorbitant rebates from drug manufacturers in exchange for formulary placement and charging administrative and other fees for administrating the rebates.

311. This conspiracy constitutes a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

312. Alternatively, this conspiracy constitutes a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. There is no legitimate business justification for, or pro-competitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any business justification or pro-competitive benefits proffered by Defendants would be pretextual, outweighed by the anticompetitive effects of Defendants' conduct and, in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

313. The direct and proximate result of Defendants' unlawful, concerted conduct is that Plaintiffs and the Class have been injured by artificially inflated rebates and fees that are passed to Plaintiffs and the Class in the form of significantly higher drug prices.

314. Plaintiffs and the other members of the Class have been injured and will continue to be injured by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Class have paid more for prescription drugs than they otherwise

would have paid in the absence of Defendants' collusive conduct. This injury is the type of injury the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

315.    The combination and conspiracy alleged herein has had the following effects, among others:

(a)    Competition in the sale of pharmaceutical benefit manager services, and therefore drug manufacturers' access to commercial insurers for the sale of prescription drugs, has been restrained, suppressed, and/or eliminated in the United States;

(b)    Such restraint of competition in the sale of pharmaceutical benefit manager services has, thereby, restrained, suppressed, and/or eliminated price competition in the prescription drug market in the United States;

(c)    The mechanisms which PBMs use to determine prescription drug prices has been fixed, raised, maintained and/or stabilized at artificially high, non-competitive levels throughout the United States and;

(d)    Entities and individuals who pay or reimburse for all or portion of the purchase price of the prescription drugs that have been processed through a PBM have been deprived of the benefits of free and open competition.

316.    Plaintiffs and Class members have been injured and will continue to be injured by paying more for prescription drugs than they would have paid and will pay in the absence of the conspiracy as alleged herein.

317.    Plaintiffs and Class members are entitled to recover damages to the maximum extent allowed under all applicable laws.

## Count II: Commercial Bribery in Violation of Section 2(c) Robinson-Patman Act
## (15 U.S.C. § 13(c)) on Behalf of the Class

318.    Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint as though full set forth herein.

319.    Section 2(c) of the Robinson-Patman Act provides that: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, *or to receive or accept*, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid." 15 U.S.C. § 13(c).

320.    Beginning in at least 2012, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, engaged in commercial bribery through the rebate and administrative fee scheme described herein, in violation of Section 2 of the Robinson-Patman Act, 15 U.S.C. § 13(c).

321.    Defendants sought, and continue to seek, exorbitant rebates and administrative fees from drug manufacturers, serving as kickbacks, bribes, and other unearned sums.

322.    Under this kickback and commercial bribery scheme, Defendants condition favorable formulary placement of specific drugs on drug manufacturers payment of excessive rebates and administrative fees to the PBMs. Drug manufacturers who offer even larger rebates may receive exclusive placement on PBMs' formularies.

323.    Because favorable formulary placement is essential for a drug manufacturer's ability to sell their products and exclusive placement provides guaranteed access to patients, drug

manufacturers are compelled to pay these kickbacks and bribes. As a result, drug manufacturers are forced to raise their list prices to afford the rebates and administrative fees.

324.    Through this scheme, Defendants have created illegal inducements that has resulted in artificially inflated drug prices and has prevented patients from obtaining the drugs they are prescribed.

325.    There is no appropriate or legitimate business justification for Defendants' anticompetitive conduct.

326.    Defendants' unlawful conduct has resulted in competitive injury to Plaintiffs and the Class by unduly restraining, hindering, suppressing and/or eliminating competition in the sale of commodities in interstate commerce.

327.    As a direct and proximate result of Defendants' unlawful actions detailed herein, Plaintiffs and the Class have been injured by artificially inflated rebates and fees that are passed to Plaintiffs and the Class in the form of significantly higher drug prices.

328.    Plaintiffs and Class members have been injured and will continue to be injured by paying more for prescription drugs than they would have paid and will pay in the absence of the commercial bribery alleged herein.

329.    Plaintiffs and Class members are entitled to recover damages to the maximum extent allowed pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

## PRAYER FOR RELIEF

330.    Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

(a)    That the Court determines that this action may be maintained as a class action under Rule 23(a), (b)(1), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct

that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

(b)     That the unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

(c)     That the unlawful kickback scheme alleged herein be adjudged and decreed commercial bribery in violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

(d)     That Plaintiffs and members of the Class recover damages, to the maximum extent allowed under applicable law, and that joint and several judgments in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be determined.

(e)     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect.

(f)     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information.

94

(g)     Plaintiffs and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint.

(h)     Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law, and

(i)     Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: February 22, 2025.

Respectfully submitted,

*/s/ Ruth Anne French*
Rex A. Sharp, MO #51205
Isaac L. Diel, MO #39503
Ruth Anne French, MO #65461
Jennifer Salva-Cushing, MO #73184
Hammons P. Hepner, MO #77258
SHARP LAW LLP
4820 W. 75th Street
Prairie Village, KS 66208
Tel.: (913) 901-0505
rsharp@midwest-law.com
idiel@midwest-law.com
rafrench@midwest-law.com
jsalvacushing@midwest-law.com
hhepner@midwest-law.com

--and--

Warren T. Burns (*pro hac vice* forthcoming)
Kyle Oxford (*pro hac vice* forthcoming)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel.: (469) 904-4550
wburns@burnscharest.com
koxford@burnscharest.com

Korey Nelson (*pro hac vice* forthcoming)
Amanda K. Klevorn (*pro hac vice* forthcoming)
Ellen E. Short (*pro hac vice* forthcoming)
BURNS CHAREST LLP
201 Saint Charles Avenue, Suite 2900
New Orleans, LA 70170
Tel: (504) 799-2845
knelson@burnscharest.com
aklevorn@burnscharest.com
eshort@burnscharest.com

--and--

Steven N. Williams (*pro hac vice* forthcoming)
STEVEN WILLIAMS LAW, P.C.
201 California Street, Suite 1100
San Francisco, CA 94105
Tel: 415-697-1509
Fax: 415-230-5310
swilliams@stevenwilliamslaw.com

--and--

Daniel C. Hedlund (*pro hac vice* forthcoming)
Michelle J. Looby (*pro hac vice* forthcoming)
Bailey Twyman-Metzger (*pro hac vice* forthcoming)
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
btwymanmetzger@gustafsongluek.com

***Attorneys for Plaintiffs and Proposed Class***