IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| SHANNON CLEMENTS,[1] <br> SKYE CLEMENTS, ALYSSIA PATTERSON, <br> IBERIA PARISH SCHOOL BOARD and <br> THE CITY OF LAUREL, MISSISSIPPI, <br> individually and on behalf of all others <br> similarly situated, <br><br>        Plaintiffs, <br> v. <br><br> CVS HEALTH CORPORATION, *et al.*, <br><br>        Defendant. | No. 25-00126-CV-W-BP |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

This case is a class action brought against several entities involved in the pharmaceutical industry, in which Plaintiffs assert the activities of pharmacy benefit managers ("PBMs") violate federal antitrust law. All Defendants have now moved for the dismissal of the case because Plaintiffs lack Article III standing and fail to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, this Motion, (Doc. 100), is **GRANTED**.[2]

### I. BACKGROUND

#### A. The Pharmaceutical Industry

The issues in this case require a brief discussion of the various entities in the pharmaceutical manufacturing, distribution, and sales chain. The chain begins with manufacturers, who manufacture the drugs and set the wholesale price for each drug. PBMs represent third-party

---

[1] Plaintiffs Shannon Clements and Alysia Patterson were voluntarily dismissed from this action.

[2] All page numbers for documents filed with the Court are those generated by the CM/ECF system and may not correspond to the original pagination.

payors, such as insurance companies, labor unions, employer coalitions, and government entities, which provide health coverage to their clients and employees. PBMs also represent and manage pharmacies. In these roles, PBMs work on behalf of their clients to (1) serve as intermediaries between the manufacturers, wholesalers, and pharmacies and (2) administer benefit management services. (*E.g.*, Doc. 87, ¶¶ 143-44.) They perform a variety of services, including, as relevant here, developing drug formularies for the third-party payors and creating and managing pharmacy networks. (*E.g.*, Doc. 87, ¶¶ 143-45.)

Formularies are tables of the drugs third-party payors cover as part of their benefit plans; the formularies also set the amount customers pay for each drug. (Doc. 87, ¶¶ 212-15.) In conjunction with establishing formularies, the PBMs also negotiate rebates for their clients (the third-party payors) to be paid by the manufacturers. (*E.g.*, Doc. 87, ¶ 230.) Rebates are calculated as a percentage of a drug's price, (*e.g.*, Doc. 87, ¶¶ 230-31), and the PBMs are paid a percentage of the rebates. (*E.g.*, Doc. 87, ¶ 236, 238.) In summary, then, a PBM negotiates a rebate from the manufacturer (from which the PBM receives a percentage), the drug is placed on the formulary, and because of the rebate the third-party payor pays less for the drug. Plaintiffs allege these facts result in higher prices to consumers because (1) manufacturers are incentivized to pay rebates to ensure their drugs are placed on formularies under favorable terms, (2) PBMs establish the formularies, not the third-party payors, and (3) because they receive a percentage of the rebate, PBMs are incentivized to generate higher rebates by giving more favorable treatment to expensive drugs even when cheaper drugs are available. (*E.g.*, Doc. 87, ¶¶ 221, 224-45, 227-31, 235-38, 253-57.) Moreover, because of the rebate, manufacturers must increase the wholesale price for their drugs to generate profit, which increases prices beyond what they would be if there was no rebate. (*E.g.*, Doc. 87, ¶¶ 239, 243, 245.) Because of their many roles in the manufacturing,

2

distribution, and sales chain, Plaintiffs allege PBMs are "the centerpiece of complex pharmaceutical distribution and pharmaceutical benefits administration operations," exerting direct and indirect control over access and customer pricing of drugs. (Doc. 87, ¶ 143.)

### B. Defendants

Defendants are alleged to operate in three groups: (1) CVS Health and Caremark (the "CVS Defendants"), (2) UnitedHealth Group and OptumRX (the "UHG Defendants"), and (3) Express Scripts (the "Express Scripts Defendants"). These groups each involve entities doing business on multiple levels of the pharmaceutical sales chain, including as PBMs and pharmacies. Plaintiffs allege facts supporting each Defendant's affiliation with one of the Defendant groups, including the ownership structure and the role each Defendant plays in the pharmaceutical sales industry. Within each Defendant group, Plaintiffs also allege that the purportedly separate entities operate as a single enterprise, consolidating power vertically along the pharmaceutical distribution and payment chain, where the holding company at the top is directly involved in management and strategy for all subsidiaries it owns. (Doc. 87, ¶¶ 22-26, 62-68, 109-15.)

The CVS Defendants are:

- CVS Health Corporation,
- CVS Pharmacy, Inc. ("CVS Pharmacy"),
- Caremark RX, L.L.C. ("Caremark RX"),
- Caremark, L.L.C ("Caremark"),
- CaremarkPCS Health, L.L.C ("CaremarkPCS"),
- CVS Specialty Pharmacy,
- Zinc Health Ventures, LLC ("Zinc Ventures"), and
- Zinc Health Services LLC ("Zinc Services").

The CVS PBMs are CaremarkPCS, Caremark RX, Caremark, Zinc Ventures, and Zinc Services. They also operate pharmacies through CVS Pharmacy, Caremark RX, Caremark, and CVS Specialty Pharmacy. The CVS Defendants also own an insurance company called Aetna, Inc.,

3

who is not a defendant. Each of the CVS Defendants are ultimately owned by CVS Health Corporation.

The UHG Defendants are:

- UnitedHealth Group, Inc. ("UnitedHealth"),
- Optum, Inc. ("Optum"),
- OptumRX, Inc. ("OptumRX"),
- OptumRX Holdings, LLC ("OptumRX Holdings"), and
- Emisar Pharma Services, LLC ("Emisar").

The UHG PBMs are OptumRX Holdings and OptumRX. They also operate a pharmacy through OptumRX. The UHG Defendants also own UnitedHealthcare, which is an insurance company but is not a defendant. Each of the UHG Defendants are ultimately owned by UnitedHealth.

The Express Scripts Defendants are:

- Evernorth Health, Inc. ("Evernorth", formerly known as Express Scripts Holdings),
- Express Scripts Pharmacy, Inc ("Express Scripts Pharmacy"),
- Ascent Health Services, LLC ("Ascent"),
- Express Scripts, Inc. ("Express Scripts"),
- Accredo Health Group, Inc. ("Accredo"),
- Express Scripts Administrators, LLC ("Express Scripts Administrators"),
- ESI Mail Pharmacy Service, Inc. ("ESI"), and
- Medco Health Solutions, Inc. ("Medco").

The Express Scripts PBMs are Express Scripts, Express Scripts Administrators, and Medco. They also operate pharmacies through Express Scripts Pharmacy, Accredo, ESI, and Medco. Each of the Express Scripts Defendants are directly or indirectly owned by Evernorth, which is owned by the insurance company Cigna Group; Cigna Group is not a party in this case.

### C. Plaintiffs

There are three remaining named Plaintiffs in this case: an individual consumer, Skye Clements, and two third-party payors, Iberia Parish School Board and the City of Laurel, Mississippi.

4

Skye Clements is consumer of the drug Tirosint, which she purchased through Missouri branches of CVS Pharmacy between 2022 and 2024. (Doc. 87, ¶ 14.) Tirosint is the brand-name version of levothyroxine, which treats hypothyroidism and thyroid cancer; it is more expensive than other versions of levothyroxine.[3] (Doc. 87, ¶ 348.) Clements allegedly paid a higher price for her Tirosint prescription than she would have without the interference of Defendants' alleged schemes. (Doc. 87, ¶ 14.)

Iberia Parish School Board ("IPSB") is a school board in Louisiana; it is a plan sponsor, providing "insurance benefits, including pharmacy benefits, to its employees and their dependents." (Doc. 87, ¶ 16.) IPSB contracts with Blue Cross and Blue Shield of Louisiana ("BCBSLA") which is represented by Express Scripts as its PBM. (Doc. 87, ¶ 16.) Plaintiffs allege that BCBSLA is a *de facto* intermediary, as Express Scripts is the entity actually setting benefits for IPSB and BCBSLA has little control over benefits management. (Doc. 87, ¶ 17.)

The City of Laurel, Mississippi ("the City of Laurel") is a municipality in Mississippi, which operates as a plan sponsor, providing "insurance benefits, including pharmacy benefits, to its employees and their dependents." (Doc. 87, ¶ 19.) The City of Laurel contracts with Blue Cross and Blue Shield of Mississippi ("BCBSMS") which is represented by Prime Therapeutics as its PBM. (Doc. 87, ¶ 19.) Prime Therapeutics is not a part of any of the three defendant groups. Plaintiffs allege that BCBSMS is a *de facto* intermediary, as Prime Therapeutics is the rebate processor for BCBSMS and it has entered into an agreement with Express Scripts to steer its patients to pharmacies affiliated with Express Scripts. (Doc. 87, ¶¶ 19-21.)

---

[3] For example, thirty 50mcg capsules of Tirosint cost $175, while thirty 50mcg capsules of Euthyrox, a different brand of the same drug, cost $18. Thirty 50mcg capsules of the generic levothyroxine can retail for as low as $4. (Doc. 87, ¶ 348.)

## D. Count I

In Count I, the individual Plaintiff and the third-party payor Plaintiffs, on behalf of nationwide classes, allege Defendants violated § 1 of the Sherman Act (15 U.S.C. § 1) by conspiring to engage in two different schemes: a "rebate scheme" and a "steering scheme." Under the rebate scheme, each of the Defendants allegedly conspired to increase and retain rebate fees via the use of rebate aggregators, which perform the PBMs' function of negotiating and contracting with manufacturers to set the rebates manufacturers must pay. (*E.g.*, Doc. 87, ¶¶ 246-47.) Plaintiffs allege that the use of rebate aggregators allows Defendants to control more rebate negotiations, giving them more control over the market and allowing them to drive out competitors and raise their own profits. (Doc. 87, ¶¶ 143, 149-57.) Plaintiffs further allege that the rebate scheme to drive up its own profits only works because, together, the three Defendant groups control almost 80% of the pharmaceutical transactions in the United States. (Doc. 87, ¶¶ 148, 156.) Because Defendants collectively control such a high percentage of the market, if manufacturers refuse to work with Defendants' rebate aggregators, their drugs cannot be profitable because very few consumers will be willing to purchase drugs which are not on their insurance company's formularies. (Doc. 87, ¶¶ 150, 228-30, 273.) In this way, Defendants are alleged to have created a bottleneck in the market, which allows them to drive up drug prices to drive up their own profits and deny market access to those manufacturers who do not agree to participate in the formulary-rebate scheme. (Doc. 87, ¶¶ 152, 154, 155.) This scheme is also designed to ensure that other PBMs without such a high market share will struggle to compete. (*See* Doc. 87, ¶ 155.) Ultimately, Plaintiffs assert that without PBM intervention, drug prices would be significantly lower.

The steering scheme involves Defendants' alleged efforts to steer customers to pharmacies affiliated with Defendants. Through vertical integration along the chain of distribution, Defendants have acquired and operate specialty, mail order, and brick-and-mortar pharmacies. (Doc. 87, ¶¶ 29-33, 36-42, 55-56, 89-92, 97-100, 123-26, 300.) Defendants allegedly use their positions with respect to the formularies and other parts of the distribution chain to implement a variety of practices to "steer" or encourage consumers to those affiliated pharmacies, including:

- Preventing patients from receiving 90-day prescriptions at unaffiliated pharmacies,
- Covering specialty medications only if they are prescribed by an affiliated pharmacy,
- Requiring that patients pay higher co-pays at competing/unaffiliated pharmacies,
- Using information obtained from consumers to target them with personalized advertisements to encourage them to patronize affiliated pharmacies.

(Doc. 87, ¶¶ 307-12.) Once customers have been steered, they allegedly pay more at affiliated pharmacies than they otherwise would have because of a variety of markup practices. (Doc. 87, ¶¶ 318-23, 333.)

### E. Count II

In Count II, the third-party payor Plaintiffs (IPSB and the City of Laurel) assert a claim on behalf of a nationwide class under § 2(c) of the Robinson-Patman Act (15 U.S.C. § 13(c)), which prohibits any payment or acceptance of a payment or discount not in repayment for goods or services. More specifically, Count II advances a commercial bribery theory, alleging that Defendants impose and receive extraordinarily high rebates in exchange for more favorable placement on formularies, which effectively constitutes the imposition of fees in exchange for access to a market they control. As explained above, by setting drug formularies, PBMs control

which drugs are covered by insurance (and to what degree they are covered) and therefore control which prescription drugs are available to consumers. Plaintiffs allege the rebates are functionally equivalent to bribes or kickbacks that are paid by manufacturers to induce Defendants to add specific drugs to the formulary. (*E.g.*, Doc. 87, ¶¶ 5, 207, 295, 445-49.)

## II. ANALYSIS

Defendants have filed a Motion to Dismiss in which they argue Plaintiffs (1) lack standing and (2) have failed to state a claim for which relief can be granted. Plaintiffs oppose dismissal, and the Court resolves the parties' arguments below. In so doing, the Court may refer to additional allegations from the Amended Complaint.

### A. Standing

Rule 12(b)(1) of the Federal Rules of Civil Procedure governs motions to dismiss for lack of subject matter jurisdiction. "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack' on jurisdiction." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quotation omitted). Defendants raise a facial challenge to Plaintiffs' standing because their arguments are based solely on the Amended Complaint's allegations and do not rely on material outside the pleadings.

Article III of the Constitution requires that plaintiffs have standing to assert their claims, *e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing must be established separately for each plaintiff, for each claim, and for each form of relief requested. *E.g.*, *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017). "[T]he irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)

(quotation omitted). An injury in fact must be an actual or imminent, concrete, and particularized invasion of a legally protected interest. *E.g.*, *id*. 339; *Lujan*, 504 U.S. at 560. Further, each named plaintiff in a class action case must allege "they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975). Defendants challenge whether standing has been properly pleaded for each individual Plaintiff. In addition, they argue that Plaintiffs do not have to standing to assert claims with respect to any drug they themselves did not purchase from one of the Defendants.

### 1. *Plaintiffs' Standing with Respect to Drugs They Paid For*

Defendants claim that "Plaintiffs fail to plead that they actually did pay more in out-of-pocket costs—or pay anything at all—in connection with their drug purchases[,]" (Doc. 101, p. 23 (emphasis removed)); however, this is incorrect. The Amended Complaint explains that each Plaintiff paid for particular drugs, (Doc. 87, ¶¶ 14, 16-21), and explicitly alleges "Plaintiffs . . . have sustained injury to their businesses or property by having paid higher prices for prescription drugs than they would have paid in absence of Defendants' illegal conduct[.]" (Doc. 87, ¶ 378; *see also* Doc. 87, ¶¶ 438-39, 441, 457-58.) Defendants do not argue these allegations are somehow inadequate; they argue they are not present when they clearly are. Therefore, Defendants have not validly challenged Plaintiffs' allegations that they suffered an injury.[4]

Defendants further argue that if Plaintiffs were injured, their allegations establish that the injuries are not traceable to Defendants' actions because the price increases were imposed by the manufacturers—that is, by third parties. The traceability requirement is satisfied if there is a causal

---

[4] Defendants delve into whether consumers who have fixed copays can suffer an injury in fact, (*e.g.*, Doc. 101, p. 24), but Plaintiffs do not allege that they paid fixed copays.

9

connection between the injury and the defendant's conduct.  *E.g.*, *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *Arc of Iowa v. Reynolds*, 94 F.4th 707, 711 (8th Cir. 2024).  A factual connection, not a legal connection, is required, *e.g.*, *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019); *Bennett*, 520 U.S. at 168-69, but the connection must not be too speculative or attenuated. *E.g.*, *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383, 390-91 (2024). And significantly for this case, "[a]n injury may be 'fairly traceable' to a defendant for causation purposes even when that defendant's actions are not 'the very last step in the chain of causation.'" *Wieland v. U.S. Dep't of Health & Hum. Servs.*, 793 F.3d 949, 954 (8th Cir. 2015) (quoting *Bennett*, 520 U.S. at 168-69).  While the injury cannot be the "result of the independent action of some third party not before the court," *Lujan*, 504 U.S. at 560, it is sufficient if the action causing injury was produced by the defendants' "coercive effect upon the action of someone else."  *Bennett*, 520 U.S. at 169.  Here, the Amended Complaint acknowledges the wholesale prices of drugs are set by the manufacturer, not Defendants.  However, Plaintiffs allege that increases in those wholesale prices occurred in response to the formulary-rebate scheme imposed by Defendants.  The Amended Complaint alleges that Defendants effectively control access to markets and demand unreasonably high and ever-increasing rebates in exchange for including the manufacturers' drugs on the formulary tables, and the manufacturers have little choice but to pay the rebates and raise prices to ensure they continue to receive a profit.  Although Defendants may not be the last step in the causal chain, the Amended Complaint sufficiently alleges Plaintiffs damages were caused by Defendants' scheme.

### 2.  *Plaintiffs' Standing with Respect to Drugs Purchased By Putative Class Members*

Defendants also contend Plaintiffs lack standing to challenge the full scope of the alleged scheme because they purchased only certain drugs.  The Court is not convinced this is properly

considered an issue related to standing; some courts conclude that, "[r]ather than a standing issue, the distinction between product types may instead create an issue for the typicality of Plaintiffs' claims or the adequacy of their representation, which is better resolved at class certification." *Barclay v. ICON Health & Fitness, Inc.*, 2020 WL 6083704, at *6 (D. Minn. Oct. 15, 2020). Even the Supreme Court has acknowledged there is "tension" between its cases as to whether this argument involves (1) a challenge to Article III standing or (2) issues related to class certification. *Gratz v. Bollinger*, 539 U.S. 244, 263 n.15 (2003). But, even if the issue relates to standing, dismissal (or, more precisely, partial dismissal) is not warranted.

Ordinarily a plaintiff establishes standing by tracing his injury to a particular product. But here, Plaintiffs challenge an alleged scheme involving a conspiracy to restrain trade, and many courts hold that standing can be extended to challenge the entirety of a scheme if there is sufficient similarity between the plaintiff's experience and the experiences of others affected by the same scheme, even if their experiences involve different products. *See*, *e.g.*, *Goldman v. Tapestry, Inc.*, 501 F. Supp. 3d 662, 667 (E.D. Mo. 2020); *Barclay*, 2020 WL 6083704, at *6; *In re Visio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1218 (C.D. Cal. 2017); *Davidson v. Kimberly-Clark Corp.*, 2014 WL 3919857, at *6 (N.D. Cal. Aug. 8, 2014); *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 551 (S.D.N.Y. 2013). Whether a plaintiff's claims are "substantially similar" is based on "whether the plaintiff's averred injury is substantially similar to the claims of those she seeks to represent." *In re Vizio*, 238 F.Supp.3d at 1218. As the Second Circuit has explained, a plaintiff has standing to assert claims on behalf of absent class members "if they plausibly allege[ ] '(1) that they personally have suffered some actual injury as a result of the purportedly illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same

defendants.'" *Collins v. Northeast Grocery, Inc.*, 149 F.4th 163, 174 (2d Cir. 2025) (quoting *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (cleaned up). Under these cases, Plaintiffs have standing because they allege Defendants conspired to employ a scheme that violates the antitrust laws, in which case their injuries—as well as the injuries of the absent class members—all derive from the same illegal scheme.

This conclusion is consistent with decisions from the Supreme Court. For instance, in *Gratz v. Bollinger*, a university's admission policies were subjected to a constitutional challenge. One of the plaintiffs sought admission as a transfer student, and the Court discussed whether he had standing to represent a class that included those seeking admission as freshmen. 539 U.S. 244, 263-65 (2003). After "question[ing] whether the relevance of this variation, if any, is a matter of Article III standing at all or whether it goes to the propriety of class certification," *id*. at 263, the Court held that plaintiff would have standing because the same admission policy was used for both freshmen and transfer students, and the claims involving transfer admissions did "not implicate a *significantly different* set of concerns" than freshman admissions. *Id.* at 265 (emphasis supplied). In reaching this conclusion, the Court in *Gratz* contrasted its decision in *Blum v. Yaretsky*, 457 U.S. 992 (1982), which it characterized as holding that a plaintiff who was transferred to a lower level of medical care could not represent a class that included patients who had been transferred to higher levels of care. It explained the different outcome in *Blum* was based on its "f[inding] that transfers to lower levels of care involved a number of fundamentally different concerns than did transfers to higher ones." *Id*. at 64 (citing *Blum*, 457 U.S. at 1001).

This case is closer to *Gratz* than to *Blum*. Plaintiffs allege they were injured by Defendants' scheme to inflate the prices of drug. The scheme did not target specific drugs or patients but affected all individuals who purchased drugs. The scheme also did not operate in a significantly

12

different manner for different drugs. The fact that the scheme affected Plaintiffs through the inflated prices of specific drugs does not deprive them of standing to challenge the scheme as a whole, and the only difference between Plaintiffs and the other class members is the degree of injury based on the price of the specific drug and the amount purchased. Thus, the Court concludes the claims of the named Plaintiffs and the class are substantially similar, and Plaintiffs have standing to represent a class consisting of all persons allegedly injured by Defendants' scheme.

### B. The Legal Viability of Plaintiffs' Claims

Under Rule 12(b)(6), the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiff[ ]." *Stodghill v. Wellston School Dist.*, 512 F.3d 472, 476 (8th Cir. 2008).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.... The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted). A claim is facially plausible if it allows the reasonable inference that the defendant is liable for the conduct alleged. *E.g., Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Horras v. American Capital Strategies, Ltd.*, 729 F.3d 798, 801 (8th Cir. 2013). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### *1. Count I – 15 U.S.C. § 1 (Sherman Act)*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Whether a defendant has engaged in a conspiracy is based on the "'basic distinction . . . between concerted and independent action' that distinguishes § 1 of the Sherman Act from § 2." *American Needle, Inc. v. National Football League*, 560 U.S. 183, 190 (2010) (quoting *Copperweld Corp. v. Independent Tube Corp.*, 467 U.S. 752, 767 (1964) (internal citations omitted)). "[T]o satisfy the concerted action requirement, the plaintiff must demonstrate that the defendants shared a 'unity of purpose or a common design and understanding, or a meeting of the minds' to engage in the conduct prohibited by the Sherman Act." *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1273 (8th Cir. 1983) (quoting *American Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)); *see also Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543-44 (8th Cir. 2015). While direct evidence can support a § 1 claim, such evidence is rare and is not mandatory. *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004). "Because defendants typically cannot be relied on to confess that they have entered into an unlawful agreement, conspiracy cases usually must be proved by circumstantial evidence." *Id.* (citing *ES Development, Inc. v. RWM Enterprises, Inc.*, 939 F.2d 547, 553 (8th Cir. 1991)).

Plaintiffs argue that the parallel conduct of the Defendants and circumstances surrounding their conduct is circumstantial evidence supporting the existence of a conspiracy. More specifically, Plaintiffs claim Defendants conspired to (1) create rebates in a manner that artificially raise prices and thereby increases rebate fees paid to Defendants at consumers' expense and (2) use patient steering practices to push consumers to affiliated pharmacies and further enhance

Defendants' power to raise prices. Defendants' alleged conduct in these schemes, however, is not sufficiently parallel to support a circumstantial claim for a conspiracy.

"[P]arallel conduct among defendants should be viewed with a broad lens[,]"*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 81-82 (2d Cir. 2025), but conduct which is equally "consistent with permissible activity as with illegal conspiracy" is not enough to support a claim for a Sherman Act violation. *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1032 (8th Cir. 2000) (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). Instead, the allegations must "tend[ ] to exclude the possibility that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 552 (2007). "Pleading only parallel conduct or other conduct merely consistent with an agreement is not sufficient to show a conspiracy." *Insulate SB*, 797 F.3d at 544 (cleaned up; quotation omitted). As the Supreme Court explained:

> [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

*Bell Atl.*, 550 U.S. at 556–57. "[S]omething more than merely parallel behavior" must be alleged. *Id.* at 560.

Here, Plaintiffs have not alleged parallel conduct. One factor in determining whether Defendants acted parallel is the timeframe of each Defendants' action. For example, in *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, the Eighth Circuit considered allegations that CVS and Express Scripts violated the Sherman Act by conspiring with PBM-owned pharmacies to boycott other pharmacies and concluded that six months between actions of alleged co-

15

conspirators was insufficient to suggest parallel activity. 911 F.3d 505, 516-17 (8th Cir. 2018). The court explained that it was "not hold[ing] that actions taken within six months of each other can never constitute parallel conduct, but only that the terminations [t]here, executed under dissimilar circumstances and separated by six months, did not constitute parallel conduct." *Id.* at 517. Other circuits have found that more than a year between actions is too much time. *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011) (finding that a year and a month between alleged coconspirator conduct did not support a determination that it was parallel).

Despite Plaintiffs' argument that Defendants acted at the same time, the Amended Complaint alleges that the conduct occurred at different times over the course of years. For instance, with respect to the rebate scheme, Plaintiffs allege that rebate aggregators are central to the scheme but admit that the Defendants created rebate aggregators over the course of three years, with the Express Scripts Defendants creating Ascent in 2019; CVS Defendants creating Zinc in 2020; and the UHG Defendants creating Emisar in 2021. (Doc. 87, ¶¶ 54, 94, 131.) Similarly, Defendants allegedly began their exclusionary formulary practices over a period of years, with CVS Defendants starting in 2012, Express Scripts Defendants in 2014, and UHG Defendants in 2016. (Doc. 87, ¶ 217.) Because these actions were years apart, they cannot be considered parallel conduct.

The Court comes to the same conclusion with respect to the steering scheme. Plaintiffs allege Defendants employed similar tactics over a similar time period to encourage customers to choose Defendant's pharmacies over others, especially for high-cost or "specialty" medication. However, the Amended Complaint fails to allege Defendants engaged in parallel conduct with respect to this alleged scheme. For example, Plaintiffs rely on communications each Defendant sent its patients to steer patients to a particular pharmacy, but the communications differ

16

substantially. (Doc. 87, ¶¶ 309-312.) The Express Scripts communications notified consumers about higher copays at competing pharmacies but did not mention those higher copays resulted from negotiations by Express Scripts' PBMs. (Doc. 87, ¶ 309.) The CVS communications are alleged to make false claims to consumers about coverage. (Doc. 87, ¶ 311.) The UHG communications allegedly specified that consumers would pay a discounted price only at affiliated pharmacies, while their drugs would no longer be covered elsewhere. (Doc. 87, ¶ 312.) Further, these communications occurred between 2020 and 2024. Because the communications are not similar and occurred over four years, they cannot be considered parallel conduct.

The allegations of aligned activity fail because similarities in business activities alone do not prove conspiratorial parallel conduct and because the timing must also be parallel. Plaintiffs argue they have alleged surrounding circumstances which they claim could serve as the "something more," (Doc. 127, pp. 26-33), but surrounding circumstances do not create an inference of conspiracy unless there is also parallel conduct.[5] Therefore, the fact that each of the Defendants engaged in separate, although similar, business practices over several years is not enough to support Plaintiffs' antitrust claims, and the Sherman Act claim, Count I, must be dismissed.

### 2. Count II – Robinson-Patman Act (15 U.S.C. § 13(c))

Defendants argue Plaintiffs do not have antitrust standing for their Robinson-Patman Act claim (Count II), because they fail to allege an antitrust injury. Antitrust plaintiffs must establish

---

[5] The Court makes clear that it is not holding there is "something more" that would be sufficient to create an inference of a conspiracy if parallel conduct was alleged. To the contrary, there is significant question as to whether Plaintiffs' allegations create an inference that Defendants entered an agreement to act together, or whether they are just as consistent with an inference Defendants simply copied each other's business practices and thus do not tend to exclude the possibility Defendants acted independently. *See Bell Atl.*, 550 U.S. at 552. However, in the absence of allegations of parallel conduct, there is no need for the Court to consider this issue.

17

not only constitutional standing but also "antitrust standing," which requires an "antitrust injury." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015). This concept is separate from constitutional standing requirements and is an aspect of the merits of the claim itself. *E.g.*, *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 934 (8th Cir. 2012).[6]

A plaintiff suing under one of the antitrust statutes cannot merely rely on "an injury causally linked to" a violation of the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "An 'antitrust injury' is an 'injury of the type the antitrust laws were intended to prevent . . . that flows from that which makes defendants' acts unlawful.'" *Insulate SB, Inc.*, 797 F.3d at 542 (quoting *Brunswick Corp.*, 429 U.S. at 489). Put another way, "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations would be likely to cause." *Brunswick Corp.*, 429 U.S. at 489 (quotation omitted; cleaned up). While paying a higher price for goods can qualify as an antitrust injury, *e.g.*, *Southeast Missouri Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 625 (8th Cir. 2011), the inquiry also requires consideration of the injuries intended to be addressed by the statutory provision the plaintiff has invoked. Whether an injury qualifies as an antitrust injury depends on the particular claim that the plaintiff brings because, as stated earlier, an antitrust injury is one that would result from a violation of the statute at issue. *E.g.*, *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *Cargill, Inc. v. Monfort of CO, Inc.*, 479 U.S. 104, 110 n.5 (1986); *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006).

---

[6] The parties also discussed antitrust standing with respect to the Sherman Act claim in Count I, but the Court dismissed that claim for other reasons and found it unnecessary to address antitrust standing for that claim.

Plaintiffs invoke the portion of the Robinson-Patman Act that prohibits, among other things, accepting anything of value or allowing a discount in lieu of compensation for anything other than services rendered in connection with the sale or purchase of goods. 15 U.S.C. § 13(c). This prohibition is intended to "curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." *F.T.C. v. Henry Broch & Co.*, 363 U.S. 166, 168 (1960).

Here, the third-party payor Plaintiffs allege they paid unfairly increased prices for drugs as a result of Defendants' scheme to receive rebates in exchange for placing a particular drug on the formulary. While this is a proper injury under some antitrust laws, the Robinson-Patman Act is different. "Unlike the Sherman Act, which protects *competition,* not *competitors*, the Robinson–Patman Act extends its protection to competitors." *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 528 (1st Cir. 1989) (quotation omitted; emphasis in original); *see also Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 272 (5th Cir. 1979). It protects smaller companies from the ill effects of discriminatory actions by large companies by protecting access to the market or to goods for sale. *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1339 (8th Cir. 1987); *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 742 (3d Cir. 2004). But in this case, the third-party payor Plaintiffs are acting as ultimate consumers, rather than as Defendants' competitors, and their alleged damages are not related to access to drugs but rather to the incidental cost increase in the drugs resulting from Defendant's alleged rebate scheme. In an alleged commercial bribery scheme, "paying inflated purchasing prices to vendors, without more, is [not] an injury of the type the antitrust laws were intended to prevent that flows from that which makes the defendants acts unlawful" *Id*. at 738-39 (internal citations omitted). Accordingly, third-party payor Plaintiffs' alleged injury is not the type of injury the Robinson-Patman Act was

19

designed to address, and the third-party payor Plaintiffs do not have antitrust standing for Count II.  Count II is dismissed.

### III. CONCLUSION

The Motion to Dismiss (Doc. 100), is **GRANTED**.  Plaintiffs have Article III standing to assert their claims.  However, Count I, the Sherman Act Claim, is dismissed because Plaintiffs failed to allege parallel activity on the part of Defendants, which is necessary to support either scheme addressed by Count I.  And Count II, the Robinson-Patman Claim, is dismissed because Plaintiffs fail to allege they have antitrust standing.

**IT IS SO ORDERED.**

Date: January 20, 2026

/s/ Beth Phillips
BETH PHILLIPS, JUDGE
UNITED STATES DISTRICT COURT